HAYNES, Circuit Judge,
joined by STEWART, Chief Judge, and DAVIS, PRADO, SOUTHWICK, GRAVES, and HIGGINSON, Circuit Judges, in full; DENNIS and COSTA, Circuit Judges, joining in all but Part II.A.1 and *225 concurring in the judgment.[1]
In 2011, Texas (“the State”) passed Senate Bill 14 (“SB 14”), which requires individuals to present one of several forms of photo identification in order to vote. See Act of May 16, 2011, 82d Leg., R.S., ch. 123, 2011 Tex. Gen. Laws 619. Plaintiffs filed suit challenging the constitutionality and legality of the law. The district court held that SB 14 was enacted with a racially discriminatory purpose, has a racially discriminatory effect, is a poll tax, and unconstitutionally burdens the right to vote. See Veasey v. Perry, 71 F.Supp.3d 627, 633 (S.D. Tex. 2014). The State appealed from that decision, and a panel of our court affirmed in part, vacated in part, and remanded the case for further findings. See Veasey v. Abbott, 796 F.3d 487, 493 (5th Cir. 2015), reh’g en bane granted, 815 F.3d 958 (5th Cir. 2016). The State filed a petition for this court to rehear the case en banc, which we granted.
I. Background

A. Senate Bill 14

Prior to the implementation of SB 14, a Texas voter could cast a ballot in person by presenting a registration certificate — a document mailed to voters upon registration. Tex. Elec. Code §§ 13.142, 63.001(b) (West 2010). Voters appearing without the certificate could cast a ballot by signing an affidavit and presenting one of multiple forms of identification (“ID”), including a current or expired driver’s license, a photo ID (including employee or student IDs), a utility bill, a bank statement, a paycheck, a government document showing the voter’s name and address, or mail addressed to the voter from a government agency. Id. §§ 63.001, 63.0101 (West 2010).
With the implementation of SB 14, Texas began requiring voters to present certain specific forms of identification at the polls. These include: (1) a Texas driver’s license or personal identification card issued by the Department of Public Safety (“DPS”) that has not been expired for more than 60 days; (2) a U.S. military identification card with a photograph that has not been expired for more than 60 days; (3) a U.S. citizenship certificate with a photo; (4) a U.S. passport that has not been expired for more than 60 days; (5) a license to carry a concealed handgun issued by DPS that has not been expired for more than 60 days; or (6) an Election Identification Certificate (“EIC”) issued by DPS that has not been expired for more than 60 days.[2] Tex. Elec. Code § 63.0101 (West Supp. 2014).[3]
SB 14 states that DPS “may not collect a fee for an [EIC] or a duplicate [EIC],” *226 Tex. Transp. Code § 521A.001(b) (West 2013), and allows DPS to promulgate rules for obtaining an EIC, id. § 521A.001(f); § 521.142. To receive an EIC, DPS rules require a registered voter to present either: (A) one form of primary ID, (B) two forms of secondary ID, or (C) one form of secondary ID and two pieces of supporting identification. 37 Tex. Admin. Code § 15.182(1). Thus, any application for an EIC requires either one Texas driver’s license or personal identification card that has been expired for less than two years, or one of the following documents, accompanied by two forms of supporting identification: (1) an original or certified copy of a birth certificate from the appropriate state agency; (2) an original or certified copy of a United States Department of State Certification of Birth for a U.S. citizen born abroad; (3) U.S. citizenship or naturalization papers without a photo; or (4) an original or certified copy of a court order containing the person’s name and date of birth and indicating an official change of name and/or gender. Id. § 15.182(3).[4]
Before May 27, 2015, a statutory provision distinct from SB 14 imposed a $2 or $3 fee for a certified copy of a birth certificate.[5] Tex. Health & Safety Code § 191.0045 (West 2010). Ás discussed below, after the district court issued its judgment and the panel conducted oral argument in this case, the Texas Legislature passed Senate Bill 983 during the 2015 legislative session and eliminated this fee.
Persons who have a disability are exempt from SB 14’s photo ID requirement if they are able to provide the voter registrar with documentation of their disability from the U.S. Social Security Administration or Department of Veterans Affairs. Tex. Elec. Code § 13.002(f) (West Supp. 2014). Other persons may vote by provisional ballot without a photo ID if they file affidavits either asserting a religious objection to being photographed or asserting that their SB 14 ID was lost or destroyed as a result of a natural disaster occurring within 45 days of easting a ballot. Id. § 65.054. Additionally, voters who will be 65 or older as of the date of the election may vote early by mail. Id. § 82.003.
If a voter is unable to provide SB 14 ID at the poll, the voter can cast a provisional ballot after executing an affidavit stating that the voter is registered and eligible to vote. Id. § 63.001(a), (g). The vote counts if the voter produces SB 14 ID to the county registrar within six days of the election. Id. § 65.0541.
SB 14 requires county registrars to inform applicants of the new voter ID requirements when issuing voter registration certificates, id. § 15.005, and requires both the Secretary of State and voter registrar *227 of each county with a website to post SB 14’s requirements online. Id. § 31.012(a). The requirements must also be placed prominently at polling places. Id. § 62.016. Additionally, the Secretary of State must “conduct a statewide effort to educate voters regarding the identification requirements for voting.” Id. § 31.012(b). The district court found that SB 14 allocated a one-time expenditure of $2 million for voter education.[6] Veasey v. Perry, 71 F.Supp.3d at 649.

B. Procedural History

The State began enforcing SB 14 on June 25, 2013.[7] The plaintiffs and interve-nors[8] (collectively, “Plaintiffs”) filed suit against Defendants to enjoin enforcement of SB 14, and their suits were consolidated before one federal district court in the Southern District of Texas. See Veasey v. Perry, 71 F.Supp.3d at 632. Plaintiffs claim that SB 14’s photo identification requirements violate the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act because SB 14 was enacted with a racially discriminatory purpose and has a racially discriminatory effect. Plaintiffs also claim that SB 14’s photo ID requirement places a substantial burden on the fundamental right to vote under the First and Fourteenth Amendments, and constitutes a poll tax under the Fourteenth and Twenty-Fourth Amendments. The State defends SB 14 as a constitutional requirement imposed to prevent in-person voter fraud and increase voter confidence and turnout.
The district court conducted a nine-day bench trial at which dozens of expert and lay witnesses testified by deposition or in person. Following that bench trial, the district court issued a lengthy and comprehensive opinion holding:
SB 14 creates an unconstitutional burden on the right to vote [under the First and Fourteenth Amendments], has an impermissible discriminatory effect against Hispanics and African-Americans [under Section 2 of the Voting Rights Act], and was imposed with an unconstitutional discriminatory purpose *228 [in violation of the Fourteenth and Fifteenth Amendments and Section 2], [Furthermore,] SB 14 constitutes an unconstitutional poll tax [under the Fourteenth and Twenty-Fourth Amendments].
Veasey v. Perry, 71 F.Supp.3d at 633. Shortly before in-person early voting was scheduled to begin for the November 2014 elections, the district court “enter[ed] a permanent and final injunction against enforcement of the voter identification provisions [of SB 14], Sections 1 through 15 and 17 through 22.”[9] id. at 707 & n.583. Since it struck the State’s voter ID law so close to the impending November 2014 election, the district court ordered the State to “return to enforcing the voter identification requirements for in-person voting in effect immediately prior to the enactment and implementation of SB 14.” Id. at 707. The district court retained jurisdiction to review any remedial legislation and to pre-approve any administrative remedial measures. Id. at 707-08.
In October 2014, the State appealed the district court’s final judgment, and a panel of this court granted the State’s emergency motion for stay pending appeal, grounding its decision primarily in “the importance of maintaining the status quo on the eve of an election.” Veasey v. Perry, 769 F.3d 890, 895 (5th Cir. 2014). Plaintiffs filed emergency motions before the Supreme Court, seeking to have this court’s stay vacated. The Supreme Court denied these motions to vacate the stay of the district court’s judgment. See Veasey v. Perry, — U.S. -, 135 S.Ct. 9, 190 L.Ed.2d 283 (2014). Therefore, this court’s stay of the district court’s injunction remained in place, and SB 14 continues to be enforced.
On May 27, 2015, after oral argument was heard by the panel that initially considered this appeal, Senate Bill 983 (“SB 983”) was signed into law, eliminating the fee “associated with searching for or providing a record, including a certified copy of a birth record, if the applicant [for the record] states that the applicant is requesting the record for the purpose of obtaining an election identification certificate.” Act of May 25, 2015, 84th Leg., R.S., ch. 130, 2015 Tex. Sess. Laws Serv. Ch. 130 (codified as an amendment to Tex. Health & Safety Code § 191.0046(e)) (hereinafter “SB 983”). SB 983 became effective immediately. Id. §§ 2-3 (codified as note to Tex. Health & Safety Code § 191.0046); see also S.J. of Tex., 84th Leg., R.S., 1449-50 (2015) (reporting unanimous passage out of the Texas Senate); H.J. of Tex., 84th Leg., R.S., 4478-79 (2015) (reporting passage by 142 to 0, with one member absent, in the Texas House). SB 983 provides that “a local registrar or county clerk who issues a birth record” required for an EIC that would otherwise be entitled to collect a fee for that record “is entitled to payment of the amount from the [Department [of State Health Services].” Act of May 25, 2015, 84th Leg., R.S., ch. 130 (codified as an amendment to Tex. Health & Safety Code § 191.0046(f)). SB 983 did not appropriate funds to spread public awareness about the free birth records. The parties addressed the potential effect of SB 983 on their claims *229 before both the panel and our full court, and we have accounted for its passage.[10]
Considering the State’s appeal from the district court’s judgment, the panel opinion held that the district court committed legal errors in conducting its discriminatory purpose analysis; therefore, it vacated that portion of the district court’s opinion and remanded the case for further proceedings. See Veasey, 796 F.3d at 493, 498. Noting that the finding on remand might be different, the panel opinion addressed the Plaintiffs’ other claims. Id. at 493. It affirmed the district court’s finding that SB 14 has a discriminatory effect in violation of Section 2 of the Voting Rights Act and remanded for consideration of the proper remedy. Id. It vacated the district court’s holding that SB 14 constitutes a poll tax and rendered judgment on that claim for the State. Id. Finally, the panel opinion vacated the district court’s determination that SB 14 violates the First and Fourteenth Amendments of the U.S. Constitution, pursuant to the doctrine of constitutional avoidance, and dismissed those claims. Id.
While this case was awaiting oral argument before our full court, in light of the upcoming elections in November 2016, the parties applied to the Supreme Court to vacate the stay of the district court’s injunction that a panel of this court originally entered in October 2014. The Supreme Court denied the motion to vacate the stay but noted that if, by July 20, 2016, this court had “neither issued an opinion on the merits of the case nor issued an order vacating or modifying the current stay order, an aggrieved party [could] seek interim relief from th[e Supreme] Court by filing an appropriate application.” Veasey v. Abbott, — U.S. ——, 136 S.Ct. 1823, 194 L.Ed.2d 828 (2016).
II. Section 2 of the Voting Rights Act

A. Discriminatory Purpose

The State appeals the district court’s holding that SB 14 was passed with a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act. We review this determination for clear error. “If the district court’s findings are plausible in light of the record viewed in its entirety, we must accept them, even though we might have weighed the evidence differently if we had been sitting as a trier of fact.” Price v. Austin Indep. Sch. Dist., 945 F.2d 1307, 1312 (5th Cir. 1991) (citation omitted). However, when the district court’s “findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue,” Pullman-Standard v. Swint, 456 U.S. 273, 292, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), in which case reversing and rendering is the proper course, Meche v. Doucet, 777 F.3d 237, 246-47 (5th Cir.), *230 cert. denied, — U.S. -, 136 S.Ct. 111, 193 L.Ed.2d 38 (2015).
We apply the framework articulated in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265-68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), to determine whether SB 14 was passed with a discriminatory purpose. Although the district court properly cited the Arlington Heights framework, we conclude that some “findings are infirm,” necessitating a remand on this point. Pullman-Standard, 456 U.S. at 292, 102 S.Ct. 1781. Since the record does not “permit[] only one resolution of the factual issue,” and there is evidence that could support the district court’s finding of discriminatory purpose, we must remand for a reweighing of the evidence.[11] See id.

1. Legal Errors in the District Court’s Analysis

“Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.” Arlington Heights, 429 U.S. at 265, 97 S.Ct. 555. However, “[r]acial discrimination need only be one purpose, and not even a primary purpose,” of an official action for a violation to occur. United States v. Brown, 561 F.3d 420, 433 (5th Cir. 2009) (citation omitted). “Legislative motivation or intent is a paradigmatic fact question.” Prejean v. Foster, 227 F.3d 504, 509 (5th Cir. 2000) (citing Hunt v. Cromartie, 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999)). “Proving the motivation behind official action is often a problematic undertaking.” Hunter v. Underwood, 471 U.S. 222, 228, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985).
In Arlington Heights, the Supreme Court set out five nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose,[12] and courts must perform a “sensitive inquiry into such circumstantial and *231 direct evidence of intent as may be available.”[13] See 429 U.S. at 266-68, 97 S.Ct. 555. “Those factors include: (1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body.” Overton v. City of Austin, 871 F.2d 529, 540 (5th Cir. 1989) (citing Arlington Heights, 429 U.S. at 267-68, 97 S.Ct. 555). Legislators’ awareness of a disparate impact on a protected group is not enough: the law must be passed because of that disparate impact. Pers. Adm’r of Mass. v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). The challengers bear the burden to show that racial discrimination was a “ ‘substantial’ or ‘motivating’ factor behind enactment of the law”; if they meet that burden, “the burden shifts to the law’s defenders to demonstrate that the law would have been enacted without this factor.” Hunter, 471 U.S. at 228, 105 S.Ct. 1916 (citation omitted).
The State’s stated purpose in passing SB 14 centered on protection of the sanctity of voting, avoiding voter fraud, and promoting public confidence in the voting process. No one questions the legitimacy of these concerns as motives. The disagreement centers on whether SB 14 was passed with impermissible motives as well. We recognize that evaluating motive, particularly the motive of dozens of people, is a difficult enterprise. We acknowledge the charged nature of accusations of racism, particularly against a legislative body, but we must also face the sad truth that racism continues to exist in our modern American society despite years of laws designed to eradicate it. We appreciate the district court’s efforts to address this difficult inquiry. Nonetheless, we hold that much of the evidence upon which the district court relied was “infirm.” See Pullman-Standard, 456 U.S. at 292, 102 S.Ct. 1781.
One type of evidence on which the district court relied in seeking to discern the Legislature’s intent was Texas’s history of enacting racially discriminatory voting measures. See Veasey v. Perry, 71 F.Supp.3d at 633-36. It noted, for instance, Texas’s use of all-white primaries from 1895-1944, literacy tests and secret ballots from 1905-1970, and poll taxes from 1902-1966. Id. at 634-35. While the record also contains more contemporary examples, see id. at 635, 636 & n.23, the district court relied too heavily on the evidence of State-sponsored discrimination dating back hundreds of years, cf. Shelby Cty. v. Holder, — U.S. -, 133 S.Ct. 2612, 2628, 186 L.Ed.2d 651 (2013) (noting that “history did not end in 1965”).
*232 “The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes,” Arlington Heights, 429 U.S. at 267, 97 S.Ct. 555, but the Supreme Court has cautioned that “unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value,” McCleskey v. Kemp, 481 U.S. 279, 298 n.20, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (resolving that laws in force during and just after the Civil War were not probative of the legislature’s intent many years later). More recently, the Court in Shelby County also counseled against undue reliance on noncontemporary evidence of discrimination in the voting rights context. 138 S.Ct. at 2618-19, 2631 (striking down Section 4(b) of the Voting Rights Act because “the conditions that originally justified these measures no longer characterize voting in the covered jurisdictions”). In light of these cases, the most relevant “historical” evidence is relatively recent history, not long-past history.[14] We recognize that history provides context and that historical discrimination (for example, in education) can have effects for many years. But, given the case law we describe above and the specific issue in this case, we conclude that the district court’s disproportionate reliance on long-ago history was error.
We also recognize that not all “history” was “long ago” and that there were some more contemporary examples of discrimination identified by the Plaintiffs in the district court. The evidence of relatively recent discrimination cited by the district court is more probative of discriminatory intent. See, e.g., Veasey v. Perry, 71 F.Supp.3d at 635, 636 & n.23. Nonetheless, several of the relatively contemporary examples of discrimination identified by the district court are limited in their probative value in connection with discerning the Texas Legislature’s intent. For example, in a state with 254 counties, we do not find the reprehensible actions of county officials in one county (Waller County) to make voting more difficult for minorities to be probative of the intent of legislators in the Texas Legislature, which consists of representatives and senators from across a geographically vast, highly populous, and very diverse state. See Miss. State Chapter, Operation Push, Inc. v. Mabus (Operation Push), 932 F.2d 400, 409-10 (5th Cir. 1991) (stating that “[e]vi-dence of disparate registration rates or similar registration rates in individual counties could not provide dispositive support” for the claim that plaintiffs could not participate in the political process at the state level (emphasis added)).
Additionally, the district court relied on contemporary examples of statewide discrimination evidenced by two redistricting cases that, taken alone, form a thin basis for drawing conclusions regarding contemporary State-sponsored discrimination. The first, Bush v. Vera, 517 U.S. 952, 976, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), found that a Texas redistricting plan to create three majority-minority districts violated the Equal Protection Clause of the Fourteenth Amendment because race was the predominant factor, the plans ignored traditional redistricting criteria, and their shapes could only be explained as the product of unconstitutional racial gerrymandering. The second case found *233 voter dilution affecting Hispanics in the redrawing of one congressional district. See League of Latin Am. Citizens v. Perry (LULAC), 548 U.S. 399, 439-40, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006). Although citing discussions of the historic discrimination against Hispanics in Texas, 'the Court did not base its decision on a conclusion that the legislature intentionally discriminated based upon ethnicity. Id. at 440-42, 126 S.Ct. 2594. Instead, it looked at history as a context for the disenfranchisement of voters who had grown disaffected with the Hispanic Congressman the legislature sought to protect by its redrawing of the district. Id. at 438-41, 126 S.Ct. 2594. The Court did not find any vote dilution as to African Americans in the drawing of a different district. Id. at 444, 126 S.Ct. 2594. Thus, these eases do not lend support for a finding of “relatively recent” discrimination.[15]
The district court’s reliance on post-enactment speculation by opponents of SB 14 was also misplaced. Discerning the intent of a decisionmaking body is difficult and problematic. Hunter, 471 U.S. at 228, 105 S.Ct. 1916. To aid in this task, courts may evaluate “contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action Arlington Heights, 429 U.S. at 268, 97 S.Ct. 555. Where the court is asked to identify the intent of an entire state legislature, as opposed to a smaller body, the charge becomes proportionately more challenging. Hunter, 471 U.S. at 228, 105 S.Ct. 1916. As United States v. O’Brien explains:
Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress’ purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.
391 U.S. 367, 383-84, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (footnote omitted).
To ascertain the Texas Legislature’s purpose in passing SB 14, the district court mistakenly relied in part on speculation by the bill’s opponents about proponents’ motives (rather than evidence of their statements and actions). For instance, it credited the following: Representative Hernandez-Luna’s simple assertion that two city council seats in Pasadena, Texas were made into at-large seats “in order to dilute the Hispanic vote' and representation”; repeated testimony that the 2011 session was imbued with anti-immigrant sentiment;[16] and testimony by the *234 bill’s opponents that they believed the law was passed with a discriminatory purpose. Veasey v. Perry, 71 F.Supp.3d at 637, 655-57.
“The Supreme Court has ... repeatedly cautioned — in the analogous context of statutory construction — against placing too much emphasis on the contemporaneous views of a bill’s opponents.”[17] Butts v. City of New York, 779 F.2d 141, 147 (2d Cir. 1985) (citing, inter alia, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 204 n.24, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). We too have held that such statements are entitled to “little weight.” Mercantile Tex. Corp. v. Bd. of Governors of Fed. Reserve Sys., 638 F.2d 1255, 1263 (5th Cir. Unit A Feb. 1981). The Second Circuit considered such speculation in Butts and held that “the speculations and accusations of ... [a] few opponents simply do not support an inference of the kind of racial animus discussed in, for example, Arlington Heights.” 779 F.2d at 147 (citation omitted). We agree and conclude that the district court erred in relying on conjecture by the opponents of SB 14 as to the motivations of those legislators supporting the law.[18]
The district court also placed inappropriate reliance upon the type of post-enactment testimony which courts routinely disregard as unreliable. See Barber v. Thomas, 560 U.S. 474, 486, 130 S.Ct. 2499, 177 L.Ed.2d 1 (2010) (“And whatever interpretive force one attaches to legislative history, the Court normally gives little weight to statements, such as those of the individual legislators, made after the bill in question has become law.”); see also Edwards v. Aguillard, 482 U.S. 578, 596 n.19, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (“The Court has previously found the post-enactment elucidation of the meaning of a statute to be of little relevance in determining the intent of the legislature contemporaneous to the passage of the statute.”). While probative in theory, even those (after-the-fact) stray statements made by a few individual legislators voting for SB 14 may not be the best indicia of the Texas Legislature’s intent. See Operation Push, 932 F.2d at 408 (finding “isolated and ambiguous statements made by ... legislators” were not compelling evidence of that law’s discriminatory purpose); Jones v. City of Lubbock, 727 F.2d 364, 371 n.3 (5th Cir. 1984) (refusing to “judge intent from the statements [made by] ... a single member” of the legislative body).
Because the district court relied upon evidence we conclude is infirm, the district court’s opinion cannot stand as written. The next question, then, is whether we reverse and render judgment for the State or remand to the district court with instructions.

2. Remand for Re-Weighing of the Evidence

While the district court’s analysis contained some legal infirmities, the rec *235 ord also contained evidence that could support a finding of discriminatory intent. See Meche, 777 F.3d at 246-47 (noting in review of a district court’s findings following a bench trial that “[w]here findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue”). Therefore, under Pullman-Standard, 456 U.S. at 292, 102 S.Ct. 1781, we must remand the discriminatory intent issue to the district court to reweigh the factors in light of this opinion.
In Pullman-Standard, the Supreme Court reversed a panel of this court after the panel weighed the facts and rendered judgment, rather than remanding for further proceedings. Id. at 292-93, 102 S.Ct. 1781. The Pullman-Standard panel of this court had concluded that the district court erred by not considering all relevant evidence and suggested that the district court might have reached a different conclusion had it properly considered the evidence. Id. at 284-85, 292, 102 S.Ct. 1781. The Supreme Court admonished that “discriminatory intent ... is a factual matter subject to the elearly-erroneous standard ... [and] when a district court’s finding on such an ultimate fact is set aside for an error of law, the court of appeals is not relieved of the usual requirement of remanding for further proceedings to the tribunal charged with the task, of factfinding in the first instance.” Id. at 293, 102 S.Ct. 1781. The Court expressed concern that this court would ignore such an “elementary” principle and instructed that it is not the purview of this court to produce an “independent consideration of the totality of the circumstances.” Id. at 291-92, 102 S.Ct. 1781.
Pursuant to this clear guidance, our inquiry is whether “the record permits of only one resolution of the factual issue.” Id. at 292, 102 S.Ct. 1781. We conclude that it does not.
First, although the record does not contain direct evidence that the Texas Legislature passed SB 14 with a racially invidious purpose, this does not mean there is no evidence that supports a finding of discriminatory intent. “[Discriminatory intent need not be proved by direct evidence.” Rogers v. Lodge, 458 U.S. 613, 618, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); Brown, 561 F.3d at 433 (“To find discriminatory intent, direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant’s actions may be considered.” (citation omitted)). Instead, courts may consider both circumstantial and direct evidence of intent as may be available. Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555.
In this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence.[19] To require direct evidence of intent would essentially give legislatures *236 free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions. This approach would ignore the reality that neutral reasons can and do mask racial intent, a fact we have recognized in other contexts that allow for circumstantial evidence.
For example, in employment discrimination cases, we do not automatically find for an employer who proffers a race-neutral reason for terminating an employee; instead, the employee can show that this reason is pretextual. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (establishing that where an employer has offered a race-neutral reason for an adverse employment action, the employee is entitled to show that the employer’s stated reason is in fact pretext); see, e.g., Evans v. City of Houston, 246 F.3d 344, 354-56 (5th Cir. 2001) (holding that a plaintiff had provided sufficient circumstantial evidence that an employer’s reasons for demoting her were pretextual to create a genuine dispute of material fact regarding whether she was wrongfully demoted and reversing the district court’s grant of summary judgment for the employer). As we were recently reminded in Foster v. Chatman, — U.S. -, 136 S.Ct. 1737, 1751-52, 1754-55, 195 L.Ed.2d 1 (2016), people hide discriminatory intent behind seemingly legitimate reasons. If Jane were fired from an at-will job for being late once, we might conclude that firing was legitimate, until we learned that Joe, who has the very same job as Jane, was late numerous times with no penalty. Cf. Evans, 246 F.3d at 354-56. Context matters.[20] With this in mind, we now address the circumstantial evidence that could support a finding of discriminatory purpose such that the record does not permit of only one resolution of the factual issue of intent. Pullman-Standard, 456 U.S. at 292, 102 S.Ct. 1781.
The record shows that drafters and proponents of SB 14 were aware of the likely disproportionate' effect of the law on minorities, and that they nonetheless passed the bill without adopting a number of proposed ameliorative measures that might have lessened this impact. For instance, the Legislature was advised of the likely discriminatory impact by the Deputy General Counsel to the Lieutenant Governor and by many legislators, and such impact was acknowledged to be “common sense” by one of the chief proponents of the legislation.[21] See Veasey v. Perry, 71 F.Supp.3d at 657-58.
Additionally, although he was careful with his comments about the legislation, one of the authors of SB 14, Senator Fraser, testified that he “believe[s] today the *237 Voting Rights Act has outlived its useful life.” When other legislators asked Senator Fraser questions about the possible disparate impact of SB 14, he simply replied “I am not advised.” Id. at 646-47. Another senator admitted at his deposition that he and other proponents of SB 14 voted to table numerous amendments meant to expand the types of accepted IDs, expand the operating hours of DPS stations issuing voter IDs, delay implementation of SB 14 until an impact study had been completed, and other ameliorative measures. He and other proponents of SB 14 have largely refused to explain the rejection of those amendments, both at the time and in subsequent litigation. Id. The district court noted that this attitude “was out of character for sponsors of major bills.” Id. at 647.
The district court also heard evidence that SB 14 is only tenuously related to the legislature’s stated purpose of preventing voter fraud. For example, the record shows that Texas has a history of justifying voter suppression efforts such as the poll tax and literacy tests with the race-neutral reason of promoting ballot integrity. See id. at 636 & n.24. Dr. Vernon Burton, an expert in race relations, testified about the “history of official discrimination in Texas voting.” He identified some devices Texas has used to deny minorities the vote, including “the all[-]White primary, the secret ballot and the use of illiteracy[,] ... poll tax, re-registration and purging.” He testified as follows regarding “the stated rationale” for each of these devices:
Q What, in your opinion, was the stated rationale for the enactment of all[-]White primaries in Texas?
A The stated rationale was voter fraud.
Q What was the stated rationale, in your opinion, for the use of secret ballot provisions in Texas?
A The stated rationale was to prevent voter fraud.
Q And what was the stated rationale, in your opinion, for the use of the poll tax in Texas?
A The stated rationale by the State was to prevent voter fraud.
Q And how about the stated rationale for the use in Texas of re-registration requirements and voter purges?
A The stated rationale was voter fraud.
Q Dr. Burton, in your expert opinion, did these devices actually respond to sincere concerns or incidents — incidences of voter fraud?
A No.
Here, too, there is evidence that could support a finding that the Legislature’s race-neutral reason of ballot integrity offered by the State is pretextual. This bill was subjected to radical departures from normal procedures. Consideration of procedural departures is a difficult inquiry, because on the one hand, “[departures from the normal procedural sequence ... might afford evidence that improper purposes are playing a role.” Arlington Heights, 429 U.S. at 267, 97 S.Ct. 555. On the other hand, “objection[s] to typical aspects of the legislative process in developing legislation,” such as increasing the number of votes a law requires for passage, may not demonstrate an invidious intent, standing alone. Cf. Operation Push, 932 F.2d at 408-09, 408 n.6. Yet, .context matters, and evidence of procedural departures provides one potential link in the circumstantial totality of evidence the district court must consider.
In this case, for example, the procedural maneuvers employed by the Texas Legislature and the State occurred, as the district court notes, only after repeated attempts to pass voter identification bills were blocked through countervailing pro *238 cedural maneuvers. See Veasey v. Perry, 71 F.Supp.3d at 645-46. At the same time, SB 14 was subject to numerous and radical procedural departures that may lend credence to an inference of discriminatory intent. See id. at 647-51. These included: (1) getting special permission to file the bill under a low number reserved for the Lieutenant Governor’s legislative priorities; (2) Governor Perry’s decision to designate the bill as emergency legislation so that it could be considered during the first sixty days of the legislative session; (3) suspending the two-thirds rule regarding the number of votes required to make SB 14 a “special order”; (4) allowing the bill to bypass the ordinary committee process in the Texas House and Senate; (5) passing SB 14 with an unverified $2 million fiscal note despite the prohibition on doing so in the 2011 legislative session due to a $27 million budget shortfall; (6) cutting debate short to enable a three-day passage through the Senate; and (7) passing resolutions to allow the conference committee to add provisions to SB 14, contrary to the Legislature’s rules and normal practice. See id. at 647-53. Such treatment was virtually unprecedented.[22]
Texas is a huge state in land mass and population and the Legislature faces great challenges in governing. The Texas Legislature meets for regular sessions for less than five months out of every two years. Tex. Const, art. III, § 24; Tex. Gov’t Code § 301.001 (West 2013).[23] During the session; it must pass a balanced budget that will govern until the next session, based on projected revenue for the next two years. Tex. Const, art. VIII, § 22; id. art. Ill, § 49a. In recent years, the Legislature has faced many complex and controversial issues. The district court noted that the 2011 legislative session itself involved “critically important issues such as the $27 million budget shortfall and transportation funding,” none of which received “a select committee or an exception from the two-thirds rule,” as did SB 14. Veasey v. Perry, 71 F.Supp.3d at 657.
The Legislature is entitled to set whatever priorities it wishes. Yet, one might expect that when the Legislature places a bill on an expedited schedule and subjects it to such an extraordinary degree of procedural irregularities, as was the case with SB 14, such a bill would address a problem of great magnitude. Ballot integrity is undoubtedly a worthy goal. But the evidence before the Legislature was that in-person voting, the only concern addressed by SB 14, yielded only two convictions for in-person voter impersonation fraud out of 20 million votes cast in the decade leading up to SB 14’s passage.[24] See id. at 639. The *239 bill did nothing to combat mail-in ballot fraud, although record evidence shows that the potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting.[25] Id. at 641, 653.
In the context of the many pressing matters of great importance to Texas that did not result in these legislative irregularities, we cannot say that the record leads to only one factual conclusion in this case. Pullman-Standard, 456 U.S. at 292, 102 S.Ct. 1781. We cannot say that the district court had to simply accept that legislators were really so concerned with this almost nonexistent problem. Against a backdrop of warnings that SB 14 would have a disparate impact on minorities and would likely fail the (then extant) preclearance requirement, amendment after amendment was rejected. Veasey v. Perry, 71 F.Supp.3d at 650-52, 698, 701-02, 708-10. While cloaking themselves in the mantle of following Indiana’s voter ID law, which had been upheld against a (different) challenge in Crawford, the proponents of SB 14 took out all the ameliorative provisions of the Indiana law. See, e.g., id. at 651-52 (noting the Texas House stripped an indi-gency exception that had been added to SB 14 in the Texas Senate); cf. Frank v. Walker (Frank II), 819 F.3d 384, 386-87 (7th Cir. 2016) (noting that an indigency exception may be necessary for voters who face “high hurdles” to obtaining required photo identification and that the Indiana law the Court considered in Crawford contained such an indigency exception).[26]
This circumstantial evidence of discriminatory intent is augmented by contemporary examples of State-sponsored discrimination in the record. For example, the record shows that as late as 1975, Texas attempted to suppress minority voting through purging the voter rolls, after its former poll tax and re-registration require *240 ments were ruled unconstitutional. See Veasey v. Perry, 71 F.Supp.3d at 635.[27] It is notable as well that “[i]n every redistricting cycle since 1970, Texas has been found to have violated the [Voting Rights Act] with racially gerrymandered districts.” Id. at 636 & n.23 (collecting cases).[28] Furthermore, record evidence establishes that the Department of Justice objected to at least one of Texas’s statewide redistricting plans for each period between 1980 and the present, while Texas was covered by Section 5 of the Voting Rights Act. Texas “is the only state with this consistent record of objections to such statewide plans.”[29] Finally, the same Legislature that passed SB 14 also passed two laws found to be passed with discriminatory purpose. See Texas v. United States, 887 F.Supp.2d 133, 159-66 (D.D.C. 2012) (utilizing the Arlington Heights analysis and concluding the 2011 Texas Legislature created two redistricting plans with a discriminatory purpose), vacated and remanded on other grounds, — U.S. -, 133 S.Ct. 2885, 186 L.Ed.2d 930 (2013).
It is also probative that many rationales were given for a voter identification law, which shifted as they were challenged or *241 disproven by opponents. Veasey v. Perry, 71 F.Supp.3d at 653-59; see generally Foster, 136 S.Ct. at 1751-52, 1754-55 (reasoning that the fact that the government’s “principal reasons” for its action “shifted over time ... suggested] that those reasons may [have been] pretextual”). One of those rationales included preventing non-citizens from voting, even though two forms of identification approved under SB 14 are available to noncitizens. Veasey v. Perry, 71 F.Supp.3d at 654. It is likewise relevant that SB 14’s proponents refused to answer why they would not allow amendments to ameliorate the expected disparate impact of SB 14. Id. at 646-47, 650-51.
Further supporting the district court’s finding is the fact that the extraordinary measures accompanying the passage of SB 14 occurred in the wake of a “seismic demographic shift,” as minority populations rapidly increased in Texas, such that the district court found that the party currently in power is “facing a declining voter base and can gain partisan advantage” through a strict voter ID law.[30] Id. at 700.
In sum, although some of the evidence on which the district court relied was infirm, there remains evidence to support a finding that the cloak of ballot integrity could be hiding a more invidious purpose. As we have explained, the absence of direct evidence such as a “let’s discriminate” email cannot - be and is not dispositive. Because we do not know how much the evidence found infirm weighed in the district court’s calculus, we cannot simply, affirm the decision. However, it is not an appellate court’s place to weigh evidence. See Price, 945 F.2d at 1317 (“[T]he appellate court may not substitute its judgment for the district court’s.”). Thus, since there is more than one way to decide this case, and the right court to make those findings is the district court, we must remand.[31]
*242 We therefore remand this claim to the district court to “reexamin[e] ... the probative evidence underlying Plaintiffs’ discriminatory purpose claims weighed against the contrary evidence, in accord with” the appropriate legal standards we have described. Veasey, 796 F.3d at 503-04; cf. City of Richmond, v. United States, 422 U.S. 358, 378, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975) (“[W]e should be confident of the evidentiary record and the adequacy of the lower court’s consideration of it.”). The parties have not asked to offer additional evidence, and we conclude that, as to this issue, the district court should not take additional evidence. The district court may, but is not required to, entertain additional oral argument prior to issuing its new findings. The district court on remand should make its discriminatory purpose findings based on the record we have, guided by this opinion and the instructions we have given the district court about the legal infirmities in its initial findings.
Time is short, though. The Supreme Court has, in effect, set a July 20 deadline for this court to act, after which it will entertain motions for relief. Veasey v. Abbott, 136 S.Ct. at 1823. Time is also needed to communicate those modifications to the wider public so as not to disrupt the election process. Indeed, among the findings made by the district court was that the public education campaign for SB 14 at the time of trial was “grossly insufficient.” Veasey v. Perry, 71 F.Supp.3d at 649. Equally necessary in the time left before early voting begins in late October is an adequate campaign to explain not only SB 14 but also court-ordered amendments to voter identification rules. We are mindful that future litigation and appeals to this court are also distinct possibilities.
Additionally, we recognize the burden our majority opinion places on the district court to implement a remedy for the discriminatory effect violation with so little time, see infra Part II.B. Therefore, to avoid disruption of the upcoming election, we rely on equitable principles in concluding that the district court should first focus on fashioning interim relief for the discriminatory effect violation in the months leading up to the November 2016 general election. The primary concern of this court and the district court should be to ensure that SB 14’s discriminatory effect is ameliorated as Section 2 requires in time for *243 the November 2016 election, while respecting the policy choices made by the Legislature in passing SB 14. See Perry v. Perez, — U.S. -, 132 S.Ct. 934, 940-41, 181 L.Ed.2d 900 (2012) (per curiam).
We instruct the district court to take the requisite time to reevaluate the evidence and determine anew whether the Legislature acted with a discriminatory intent in enacting SB 14. But it is unnecessary for the district court to undertake this task until after the November 2016 election. See Purcell v. Gonzalez, 549 U.S. 1, 5-6, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (election permitted to continue despite unresolved issues related to disenfranchisement); see also Reynolds v. Sims, 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (noting that a court may withhold immediate relief so as not to disturb a forthcoming election). If the district court concludes that SB 14 was passed with a discriminatory intent, the district court should fashion an appropriate remedy in accord with its findings; provided, however, that any remedy will not be made effective until after the November 2016 election.

B. Discriminatory Effect

Plaintiffs allege that SB 14 has a discriminatory effect in violation of Section 2 of the Voting Rights Act, which proscribes any “voting qualification or prerequisite to voting ór standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen ... to vote on account of race or color.” 52 U.S.C. § 10301(a). Unlike discrimination claims brought pursuant to the Fourteenth Amendment, Congress has clarified that violations of Section 2(a) can “be proved by showing discriminatory effect alone.” Thornburg v. Gingles, 478 U.S. 30, 35, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); see also 52 U.S.C. § 10301(b).[32] In proscribing laws that have a discriminatory effect, Congress exercised its authority pursuant to the Fifteenth Amendment, which states that “[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude,” and gives Congress the “power to enforce this article by appropriate legislation.” U.S. Const, amend. XV.
1. The Gingles Factors and Two-Part Framework
To prove that a law has a discriminatory effect under Section 2, Plaintiffs must show not only that the challenged *244 law imposes a burden on minorities, but also that “a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.” Gingles, 478 U.S. at 47, 106 S.Ct. 2752 (emphasis added). While courts regularly utilize statistical analyses to discern whether a law has a discriminatory impact, see, e.g., Operation Push, 932 F.2d at 410-11, the Supreme Court has also endorsed factors (“the Gingles factors”) enunciated by Congress to determine whether such an impact is a product of current or historical conditions of discrimination such that it violates Section 2,[33] Gingles, 478 U.S. at 44-45, 106 S.Ct. 2752.
Although courts have often applied the Gingles factors to analyze claims of vote dilution,[34] perhaps because of past pre-clearance requirements, there is little authority on the proper test to determine whether the right to vote has been denied or abridged on account of race. See Ohio State Conference of NAACP v. Husted, 768 F.3d 524, 554 (6th Cir. 2014) (“Unsurprisingly, then, the case law has developed to suit the particular challenges of vote dilution claims. A clear test for Section 2 vote denial claims — generally used to refer to any claim that is not a vote dilution claim — has yet to emerge.”), vacated on other grounds by No. 14-3877, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014). However, the Fourth and Sixth Circuits have adopted a two-part framework that draws on the text .of Section 2 and the Supreme Court’s guidance in Gingles to analyze Section 2 claims.
(a) The Two-Part Framework
We now adopt the two-part framework employed by the Fourth and Sixth Circuits to evaluate Section 2 “results” claims. The framework has two elements:
[1] [T]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the pro-, tected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, [and]
[2] [T]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.
League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 240 (4th Cir. 2014) (citations and internal quotation marks omitted), cert. denied, — U.S. -, 135 S.Ct. 1735, 191 L.Ed.2d 702 (2015); see also Husted, 768 F.3d at 554.
The first part of this two-part framework inquires about the nature of the burden imposed and whether it creates a disparate effect in that “members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice” — this encompasses Section 2’s definition of what kinds of burdens deny or abridge the right to vote. Compare 52 U.S.C. § 10301 (proscribing denial or abridgement of the right to vote and defining how a violation of Section 2 may be established), with League of Women Voters, 769 F.3d at 240 *245 (outlining the two-part test, using almost identical language to describe an impermissible burden on the right to vote).
The second part of the two-part framework draws on the Supreme Court’s guidance in Gingles. See League of Women Voters, 769 F.3d at 240 (quoting Gingles, 478 U.S. at 47, 106 S.Ct. 2752); Husted, 768 F.3d at 554 (quoting Gingles, 478 U.S. at 47, 106 S.Ct. 2752). This second part of the framework provides the requisite causal link between the burden on voting rights and the fact that this burden affects minorities disparately because it interacts with social and historical conditions that have produced discrimination against minorities currently, in the past, or both. See Gingles, 478 U.S. at 47, 106 S.Ct. 2752 (“The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.”).
(b) The Gingles Factors
As did the Fourth and Sixth Circuits, we conclude that the Gingles factors should be used to help determine whether there is a sufficient causal link between the disparate burden imposed and social and historical conditions produced by discrimination.[35] In other words, the Gingles factors may be used to examine causality under the second part of the two-part analysis.
These factors include:
1.the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;
7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
Id. at 36-37, 106 S.Ct. 2752 (quoting S. Rep. No. 97-417, at 28-29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206-07). Two additional considerations are:
[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]
*246 [9.] whether the policy underlying the state or political subdivision’s use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

Id.

These factors are not exclusive, and “there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.” Id. at 45, 106 S.Ct. 2752 (quoting S. Rep. No. 97-417, at 29). Not every factor will be relevant in every case. These factors provide salient guidance from Congress and the Supreme Court on how to examine the current effects of past and current discrimination and how those effects interact with a challenged law. Id.; League of Women Voters, 769 F.3d at 240, 245; Husted, 768 F.3d at 554.
(c) This Analysis is Appropriate for Section 2 Effect Challenges
The State argues that the Gingles factors are inapposite in this context, and that we should apply the two-part test as it was applied in the Seventh Circuit in Frank v. Walker, 768 F.3d 744, 754-55 (7th Cir. 2014), cert. denied, — U.S. -, 135 S.Ct. 1551, 191 L.Ed.2d 638 (2015). The State also argues that if we apply the Gingles factors and two-part test and find a Section 2 violation in this case, all manner of neutral election laws may be struck down. We disagree that the Gingles .factors are inapposite here, and we have good reasons to believe that the State’s gloomy forecast is unsound.
Use of the two-factor test and the Gin-gles factors limits Section 2 challenges to those that properly link the effects of past and current discrimination with the racially disparate effects of the challenged law. Applying the Gingles factors involves engaging in a multi-factor analysis, under which no one factor has determinative weight. Gingles, 478 U.S. at 45, 106 S.Ct. 2752. Certainly, this analysis is fact dependent. Yet, in many similar contexts, we frequently employ multi-factor, totality-of-the-circumstances analyses that are highly fact bound. See, e.g., United States v. Batamula, 823 F.3d 237, 240-42 (5th Cir. 2016) (en banc) (analyzing the totality of the circumstances to determine whether a defendant was prejudiced by a lack of competent advice during the guilty plea process); Cannata v. Catholic Diocese of Austin, 700 F.3d 169, 175-76 (5th Cir. 2012) (adopting a “totality-of-the-circumstances” analysis to determine whether an employee" is a minister for purposes of the ministerial exception and abrogating the three-part test previously employed by this court, because the Supreme Court specifically rejected the use of a rigid, bright-line test for this issue); Stewart v. Miss. Transp. Comm’n, 586 F.3d 321, 330-31 (5th Cir. 2009) (applying multi-factor tests to analyze whether a supervisor created a hostile work environment or retaliated against an employee for reporting sexual harassment, and in analyzing the last factor of the hostile work environment test, looking to the totality of the circumstances to determine whether the harassment was sufficiently severe and pervasive to alter employment conditions).[36]
We conclude that the two-part framework and Gingles factors together serve as *247 a sufficient and familiar way to limit courts’ interference with “neutral” election laws to those that truly have a discriminatory impact under Section 2 of the Voting Rights Act. Just because a test is fact driven and multi-factored does not make it dangerously limitless in application.
The State argues that we should instead adopt a bright-line test as our limiting principle. As the State would have it, so long as the State can articulate a legitimate justification for its election law and some voters are able to meet the requirements, there is no Section 2 violation. This argument effectively nullifies the protections of the Voting Rights Act by giving states a free pass to enact needlessly burdensome laws with impermissible racially discriminatory impacts. The Voting Rights Act was enacted to prevent just such invidious, subtle forms of discrimination. See Chisom v. Roemer, 501 U.S. 380, 406, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (Scalia, J., dissenting); Allen v. State Bd. of Elections, 393 U.S. 544, 565-66, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). We think the factors applied to the facts are a proper limiting principle, and find this analysis faithful to the purposes of the Voting Rights Act.[37]
In addition, two district courts have now applied the same analysis we apply here to *248 two different states’ laws and have found no discriminatory results under Section 2. See, e.g., Lee v. Va. State Bd. of Elections, — F. Supp. 3d -, -, ---, No. 3:15CV357-HEH, 2016 WL 2946181, at *5, *21-24 (E.D. Va. May 19, 2016); N.C. State Conference of the NAACP v. McCrory, — F. Supp. 3d -, ---, -, -, No. 1:13CV668, 2016 WL 1650774, at *73-76, *117, *122 (M.D.N.C. Apr. 25, 2016). These district court cases illustrate three principles that the State ignores in its arguments before us: (1) the analysis we employ effectively allows examination of differing fact patterns; (2) the State’s prediction of vast judicial interference with election laws is unfounded; and (3) district courts are well suited to conduct this fact-intensive analysis in the first instance, as the institutions we rely on for fact finding day in and day out.
• Furthermore, the Seventh Circuit’s approach in Frank is not inconsistent with our own. The Seventh Circuit applied the two-part framework only “[f]or the sake of argument,” did not apply the Gingles factors, and expressed skepticism about the second step of the two-part analysis “because it does not distinguish discrimination by the [government] defendants from other persons’ discrimination.” Frank, 768 F.3d at 754-55. The Seventh Circuit ultimately did not apply the second step of the two-part analysis because it concluded that the plaintiffs failed to show that Wisconsin’s law imposed a discriminatory burden that gave minority voters less opportunity to participate in the political process at the first step of the analysis. Id. at 753, 755. Our record contains more particularized evidence of the discriminatory burden imposed by SB 14 than did the record in Frank.[38]
To the extent that the State argues causality may be established only where there is a finding that state action caused the social and historical conditions begetting discrimination, see Frank, 768 F.3d at 755, we need not and do not decide that issue. Unlike in Frank, the district court in this case found both historical and contemporary examples of discrimination in both employment and education by the State of Texas, and it attributed SB 14’s disparate impact, in part, to the lasting effects of that State-sponsored discrimination. See Veasey v. Perry, 71 F.Supp.3d at 636, 666-67. Thus, even assuming this limitation from Frank applied, the evidence here meets that test.
Finally, we reject the argument that Crawford mandates upholding SB 14 simply because the State expressed legitimate justifications for passing the law.[39] Craw *249 ford contains no mention of Section 2 or the Voting Rights Act — in that case, the Court only considered a First and Fourteenth Amendment challenge, which involves a different analytical framework than what we use for Section 2 claims. See generally 553 U.S. 181, 128 S.Ct. 1610. Additionally, the Court in Crawford analyzed only a facial challenge that had been adjudicated in the district court on summary judgment. Crawford, 553 U.S. at 187-88, 202-03, 128 S.Ct. 1610. Here, we have a multitude of factual findings about Plaintiffs’ combined challenges, based on copious evidence from a bench trial and a record that spans more than one hundred thousand pages. See generally Veasey v. Perry, 71 F.Supp.3d 627. Nevertheless, the State argues that Frank drew on Crawford to conclude Wisconsin’s law did not impose a discriminatory burden on voters because it appeared to be a generally-applicable election law.
Crawford clearly established that states have strong interests in preventing voter fraud and increasing voter confidence by safeguarding the integrity of elections. 553 U.S. at 191, 194-97, 128 S.Ct. 1610. We do not deny that the State in this case may pursue those interests, nor that they are strong and valid interests. However, that acknowledgement does not address the additional as-applied challenges Plaintiffs make in this case. See id. at 199-202, 128 S.Ct. 1610. Even the Seventh Circuit has acknowledged that Crawford does not extend as far as the State argues, holding that Frank “did not decide that persons unable to get a photo ID with reasonable effort lack a serious grievance.” Frank II, 819 F.3d at 386. The Seventh Circuit in this later iteration of Frank did not consider a Section 2 challenge. Id. at 385-86; see also Frank v. Walker, 141 F.Supp.3d 932, 934-36 (E.D. Wis. 2015), vacated in part by Frank II, 819 F.3d 384. But the court noted that neither Crawford nor Frank foreclose the argument that an indigency exception may be necessary to prevent an unconstitutional burden on plaintiffs hindered from voting and obtaining photo IDs due to financial hardship and other factors like those exhibited by the Plaintiffs in this case.[40] Frank II, 819 F.3d at 386-87. The Seventh Circuit remanded the plaintiffs’ constitutional claims to the district court for further consideration of an as-applied challenge factually similar to the one Plaintiffs make in this case. Id. at 385-86, 388.
Having established that the two-part analysis and Cingles factors are appropriate standards for examining Plaintiffs’ Section 2 claim,[41] we evaluate the district *250 court’s discriminatory effect finding for clear error. See Operation Push, 932 F.2d at 410.

2. SB 14’s Disparate Impact

The district court found that 608,-470 registered voters, or 4.5% of all registered voters in Texas, lack SB 14 ID. Veasey v. Perry, 71 F.Supp.3d at 659. Of those, 534,512 voters did not qualify for a disability exemption from SB 14’s requirements. Id. The latter figure, which was derived by comparing the Texas Election Management System with databases containing evidence of who possesses SB 14 ID, is known as the “No-Match List.”[42] Id. The district court credited expert analysis and testimony by the individual Plaintiffs, finding that SB 14 imposed excessive and disparate burdens on minority voters who lack SB 14 ID, including many Plaintiffs. Id. at 664-77. This evidence supports the district court’s findings regarding SB 14’s disparate impact.
(a) Expert Analyses of SB 14’s Impact
Plaintiffs’ experts relied on four distinct methods of analysis to determine the races of those on the No-Match List.[43] Id. at 660-62. Those included: (1) ecological regression analysis, (2) homogenous block group analysis, (3) comparing the No-Match List to a Spanish Surname Voter Registration list, and (4) reliance on data provided by Catalist LLC, a company that compiles election data. Id. at 661. The ecological regression analysis performed by Dr. Stephen Ansolabehere, an expert in American electoral politics and statistical methods in political science, which compared the No-Match List with census data, revealed that Hispanic registered voters and Black registered voters were respectively 195% and 305% more likely than their Anglo peers to lack SB 14 ID. Id. According to Dr. Ansolabehere, this disparity is “statistically significant and ‘highly unlikely to have arisen by chance.’ ” Id. *251 The homogenous block group analysis yielded similar results, and other experts. arrived at similar conclusions. Id. at 661-62. These statistical analyses of the No-Match List were corroborated by a survey of over 2,300 eligible Texas voters, which concluded that Blacks were 1.78 times more likely than Whites, and Latinos 2.42 times more likely, to lack SB 14 ID. Id. at 662-68. Even the study performed by the State’s expert, which the district court found suffered from “significant methodological oversights,” found that 4% of eligible “White voters lacked SB 14 ID, compared to 5.3% of eligible Black voters and 6.9% of eligible Hispanic voters. Id. at 663 & n.239. The district court thus credited the testimony and analyses of Plaintiffs’ three experts, each of which found that SB 14 disparately impacts African-American and Hispanic registered voters in Texas. Id. at 663.
The district court likewise concluded that SB 14 disproportionately impacts the poor, who are disproportionately minorities. Id. at 664-65. It credited expert testi-' mony that 21.4% of eligible voters earning less than $20,000 per year lack SB 14 ID, compared to only 2.6% of voters earning between $100,000 and $150,000 per year. Id. at 664. Lower income respondents were also more likely to lack the underlying documents to get an EIC. Id. Dr. Jane Henrici, an anthropologist and professorial lecturer at George Washington University, explained that:
[Unreliable and irregular wage work and other income ... affect the cost of taking the time to locate and bring the requisite papers and identity cards, travel to a processing site, wait through the assessment, and get photo identifications. This is because most job opportunities do not include paid sick or other paid leave; taking off from work means lost income. Employed low-income Texans not already in possession of such documents will struggle to afford income loss from the unpaid time needed to get photo identification.
Id. (alteration in original).
Furthermore, the court found that the poor are less likely to avail themselves of services that require ID, such as obtaining credit and other financial services. Id. They are also less likely to own vehicles and are therefore more likely to rely on public transportation. Id. at 665, 672-73. As a result, the poor are less likely to have a driver’s license and face greater obstacles in obtaining photo identification. Id. Even obtaining an EIC poses an obstacle — the district court credited evidence that hundreds of thousands of voters face round-trip travel times of 90 minutes or more to the nearest location issuing EICs. Id. at 672. Of eligible voters without access to a vehicle, a large percentage faced trips of three hours or more to obtain an EIC.[44] Id.
*252 (b) The State’s Challenges to the District Court’s Analysis
Although the State does not dispute the underlying factual findings, it identifies several purported legal errors in the district court’s decision. We address only the most relevant challenges at length herein.[45] We conclude that the district court did not reversibly err in determining that SB 14 violates Section 2 by disparately impacting minority voters.
First, the State disputes the propriety of using statistical analyses to determine the racial composition of the No-Match List. Relying on Bartlett v. Strickland, 556 U.S. 1, 17-18, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009), the State argues that the Supreme Court foreclosed using statistical analysis to determine the racial composition of a group of voters. That is a mischaracterization. Strickland cautions against adopting standards that require judges to make complicated, race-based predictions in redistricting cases, a concern that is not implicated here. Id. It is well within the district court’s purview to assess whether minorities are disproportionately affected by a change in the law based on statistical analyses. See, e.g., Operation Push, 932 F.2d at 410-11. Using accepted statistical methodologies to estimate the racial composition of Texas voters does not require the type of race-based predictions that the Court referenced in Strickland,[46] Instead, this case is more akin to Operation Push, in which this court approved using surveys and “independent statistical tests” to project the impact on minorities of newly enacted voter registration procedures. Id.
Second, the State relies on Strickland to argue that the canon of constitutional avoidance militates against requiring the *253 State to ensure that voters of various races possess voter ID in equal measure. See 556 U.S. at 18, 129 S.Ct. 1281. The district court’s discriminatory effect finding, if affirmed, would do no such thing, nor does Section 2 mandate the sort of remedy to which the State objects. Section 2 merely prohibits the State from imposing burdens on minority voters that would disproportionately abridge their ability to participate in the political process. Cf. Tex. Dep’t of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc. (“Inclusive Communities”), — U.S. -, 135 S.Ct. 2507, 2524, 192 L.Ed.2d 514 (2015) (“Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice _ If additional measures- are adopted, courts should strive to design them to eliminate racial disparities through race-neutral means. Remedial orders that impose racial targets or quotas might raise more difficult constitutional questions.” (citation omitted)).
Finally, before our full court, the State refined its argument that our holding that SB 14 violates Section 2 would make Section 2 “invalid as no longer congruent and proportional to the.Fifteenth Amendment.” Relatedly, the State and dissenting opinions characterize the district court’s findings as resting solely on a statistical disparity in SB 14 ID rates, rather than any concrete proof that voters were denied the right to vote. These arguments miss the mark. In particular, the constitutionality argument by the State is short sighted and ignores the history and text of the Fifteenth Amendment. If the State had its way, the Fifteenth Amendment and Section 2 would only prohibit outright denial of the right to vote and overtly purposeful discrimination. Yet, both the Fifteenth Amendment and Section 2 also explicitly prohibit abridgement of the right to vote. U.S. CONST, amend. XV; 52 U.S.C. § 10301(a). Application of the Gingles factors then determines whether any such abridgement is linked to social and historical conditions of discrimination such that the abridgement has occurred “on account of race.” U.S. Const, amend. XV; 52 U.S.C. § 10301(a). The standards we apply here, and our manner of applying them, show that Section 2’s protections remain closely tied to the power granted Congress by the Fifteenth Amendment.[47]
Regarding the district court’s findings, they rest on far more than a statistical *254 disparity. The district court’s lengthy opinion goes through the evidence supporting its findings in great detail, and we will not repeat all of that evidence here for the sake of clarity and brevity. See Veasey v. Perry, 71 F.Supp.3d at 665, 667-77. However, a few examples show that the district court relied on concrete evidence regarding the excessive burdens faced by Plaintiffs in making its findings. This evidence personified the expert analysis credited by the district court regarding SB 14’s discriminatory effect.
(c) Evidence of the Burdens Imposed on Plaintiffs by SB 14
The individual Plaintiffs testified that they faced many specific burdens in attempting to obtain SB 14 ID or vote. The district court found that “[t]he Plaintiffs [d]emonstrate[d] the [i]mpact” of SB 14 along several axes, including: (1) the difficulty of obtaining an EIC and voting with the proper ID because of Texas’s poor implementation of this program; (2) the cost of underlying documents necessary to obtain an EIC or other SB 14 ID; (3) diffieulties with delayed, nonexistent, out-of-state, or amended birth certificates due to nontraditional births and errors on birth certificates; (4) long distances and other travel issues that made getting to a registrar and DPS office problematic for many Plaintiffs; (5) a strict disability exemption [48]; and (6) a burdensome alternative of voting absentee. See id. Some of the Plaintiffs faced difficulties along multiple axes in attempting to get SB 14 ID and vote in person.
First, the record evidence disproves the State’s claim that “the plaintiffs have failed to identify a single individual who faces a substantial obstacle to voting because of SB 14.”[49] For one thing, the district court found that multiple Plaintiffs were turned away when they attempted to vote, and some of those Plaintiffs were not offered provisional ballots to attempt to resolve the issue. Id. at 668. One of those Plaintiffs, Floyd Carrier, “was well-known to the election workers at his polling place, but was not offered a provisional ballot and was not permitted to cast a vote.” Id. Floyd Carrier had the help of his son in *255 attempting to obtain SB 14 ID, but they faced an almost impossible bureaucratic morass when they tried to get the required underlying documentation. Due to these obstacles and the lack of training and education about SB 14’s requirements, Floyd Carrier was completely prevented from voting. See id. at 668 & n.268 (noting that throughout their efforts to obtain underlying documentation and qualifying ID for Floyd Carrier, no one informed the Carriers about the EIC).
Plaintiff Bates faced a similar problem when she reported to the polls, as she was unaware that her existing ID was insufficient until she attempted to vote in person. At that point, it was too late to cast an absentee ballot, and she was not able to obtain SB 14 ID in time to cure her provisional ballot because she could not afford to purchase her Mississippi birth certificate at its $42 cost on her $321 fixed monthly income. Id. at 649 & n.115, 665. Plaintiff Gordon Benjamin was not able to obtain an EIC at the DPS because he was unable to get his Louisiana birth certificate for the hefty $81 fee online. Eventually, his sister was able to get his birth certificate in person on a trip through Louisiana, but he was unable to make that trip before the 2013 elections. Id. at 671, 673. Benjamin cast a provisional ballot that went uncured. Many more stories like these proliferate in the pages of the district court’s opinion. Id. at 667-77.
Traveling to DPS offices to obtain EICs posed an additional obstacle for many Plaintiffs. The district court found that four Plaintiffs rely almost exclusively on public transportation. One of these Plaintiffs, Ken Gandy, faces an hour-long, one-way trip to reach the nearest DPS office. See id. at 673. Plaintiffs Estrada and Espi-nosa use family and friends for transportation, but they each face “a 60-mile round-trip ride to the nearest DPS station.” Id.
The State failed to contest any of this evidence, except to suggest that these Plaintiffs could vote by mail. The district court did not clearly err in finding that mail-in voting is not an acceptable substitute for in-person voting in the circumstances presented by this case.[50] We are by no means criticizing Texas for making mail-in voting available, as it represents an important bridge for many who would otherwise have difficulty appearing in person. Instead, we conclude that it is not the equivalent of in-person voting for those who are able and want to vote in person. Mail-in voting involves a complex procedure that cannot be done at the last minute. See id. at 688-90 (describing the complex process of obtaining and submitting a mail-in ballot).[51] It also deprives voters of the help they would normally receive in filling out ballots at the polls, which Plaintiff Naomi Eagleton cited as a reason why she prefers to vote in person. Id. at 689.
Elderly plaintiffs may also face difficulties getting to their mailboxes, like Plaintiff Carrier, who has to be driven to his mailbox because it is at the local post office. Id. at 673. Seven of the Plaintiffs further testified they are reluctant to vote by mail due to the increased risk of fraud *256 because of people who harvest mail-in ballots from the elderly. Id. at 676-77. The district court credited expert testimony showing mail-in ballot fraud is a significant threat — unlike in-person voter fraud. Id. at 689-41, 676. Finally, with mail-in voting, voters lose the ability to account for last-minute developments, like candidates dropping out of a primary race, or targeted-mailers and other information disseminated right before the election. Id. at 689. We discern no clear error in the district court’s finding that mail-in voting for specific subsets of Texas voters does not sufficiently mitigate the burdens imposed by SB 14.
The State further claims SB 14 has no disparate impact because the State offers “free” EICs, and after SB 983, free underlying documentation to Texas voters who were born in Texas. Yet, the record is replete with evidence that the State devoted little funding or attention to educating voters about the new voter ID requirements, resulting in many Plaintiffs lacking information about these supposed accommodations until they were informed about them during the course of this lawsuit. See, e.g., id. at 667-69, 676 (describing the “insufficient” implementation of the EIC program, the fact that many Plaintiffs did not know about the EIC or required voter ID until being turned away at the polls, that one Plaintiff paid $22 for his birth certificate because he was not told about the reduced-cost alternative then available, and other issues with the implementation of SB 14). We find no clear error in the district court’s finding that the State’s lackluster educational efforts resulted in additional burdens on Texas voters.[52] See, e.g., id. at 668.
We conclude that the district court did not clearly err in finding that SB 14 imposes significant and disparate burdens on the right to vote.
3. The Gingles Factors
We next consider the district court’s finding that SB 14 “produces a discriminatory result that is actionable because [it] ... interacts] with social and historical conditions in Texas to cause an inequality in the electoral opportunities enjoyed by African-Americans and Hispanic voters.” Id. at 698. The district court found Gingles factors 1, 2, 5, 6, 7, 8, and 9 probative. Id. *257 at 697. Again, we conclude it was proper to utilize the Gingles factors to determine whether conditions engendered by current and former state-sponsored discrimination are sufficiently linked to the racial disparity in ID possession under SB 14.
(a) Gingles Factor 1: History of Official Discrimination
As part of' this “searching practical evaluation of the past and present reality,” Gingles, 478 U.S. at 45, 106 S.Ct. 2752 (citation omitted), the district court found that Texas’s history of discrimination in voting acted in concert with SB 14 to limit minorities’ ability to participate in the political process. We repeat Shelby County’s admonishment that “history did not end in 1965,” 138 S.Ct. at 2628, and emphasize that contemporary examples of discrimination are more probative than historical examples. However, even long-ago acts of official discrimination give context to the analysis,[53] and the district court credited more contemporary examples of state-sponsored discrimination. Veasey v. Perry, 71 F.Supp.3d at 635-36, 700. One contemporary example is the district court’s finding that “[i]n every redistricting cycle since 1970, Texas has been found to have violated the VRA with racially gerrymandered districts.” Id. at. 636 & n.23 (collecting cases). The district court further noted that, before it was vacated along with preclearance by Shelby County, “a three-judge court had found that two of Texas’s 2011 redistricting plans violated the VRA.” Id. at 636 n.23. In other words, the 2011 Texas Legislature was found to have violated the Voting Rights Act by passing two redistricting plans that were found to have a retrogressive or racially discriminatory impact in the same legislative session that resulted in SB 14.[54]
*258 The district court found that these past instances of discrimination, all the way through the 2011 legislative session that produced SB 14, were relevant in part because each time, “the Texas Legislature relied on the justification that its discriminatory measures were necessary to combat voter fraud.” Id. at 686. The Texas Legislature relied on that same justification in passing SB 14, even though the evidence showed that in-person voter fraud “is very rare.” Id.
Even acknowledging that long-ago evidence of discrimination has less force than more contemporary evidence under Shelby County, this factor and other factors support the district court’s finding that SB 14 has a discriminatory effect.
(b) Gingles Factor 2: Racially Polarized Voting
The district court relied primarily on the testimony of Dr. Barry Burden, a political science professor, and Mr. George Korbel, an expert on voting rights, in concluding that racially polarized voting exists throughout Texas. The court stated that “[r]acially polarized voting exists when the race or ethnicity of a voter correlates with the voter’s candidate preference.” Id. at 637 (citing Gingles, 478 U.S. at 53 n.21, 106 S.Ct. 2752). For support, the district court noted that the gap between Anglo and Latino Republican support is between 30 and 40 percentage points, the Supreme Court has previously acknowledged the existence of racially polarized voting in Texas, and that in other litigation, Texas has conceded that racially polarized voting exists in 252 of its 254 counties. Id. 'at 637-38. The State did not contest these findings before the district court.[55]
(c) Gingles Factor 5: Effects of Past Discrimination
Next, the district court appraised “[t]he extent to which members of the minority group ... bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process.” Veasey v. Perry, 71 F.Supp.3d at 696 (citing Gingles, 478 U.S. at 45, 106 S.Ct. 2752). The disparity in education, employment, and health outcomes between Anglos, African Americans, and Hispanics is manifest by the fact that the 29% of African Americans and 33% of Hispanics in Texas live below the poverty line compared to 12% of Anglos. Id. at 665. The unemployment rate for Anglos is also significantly lower. At trial, the court found that 6.1% of Anglos were unemployed compared to 8.5% of Hispanics and 12.8% of African Americans. Id. at 666. Furthermore, 91.7% of Anglo 25-year-olds in Texas have graduated from high school, compared to 85.4% of African Americans, and only 58.6% of Hispanics. Id. Anglos are also significantly more likely to have completed college — 33.7% of Anglos hold a bachelor’s degree, compared to 19.2% of African Americans and 11.4% of Hispanics. Id. Finally, the district court credited testimony that African Americans and Hispanics are more likely than Anglos to report being in poor health, and to lack health insurance. Id. at 666-67.
*259 The district court found that the history of State-sponsored discrimination led to these disparities in education, employment, housing, and transportation. See id. at 636. For example, according to Dr. Vernon Burton, a professor with an expertise in race relations, past State-sponsored employment discrimination and Texas’s maintenance of a “separate but equal” education system both contributed to the unequal outcomes that presently exist. Id. Although Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), mandated desegregated schools in 1954, Dr. Burton testified that Texas maintained segregated schools until roughly 1970. Veasey v. Perry, 71 F.Supp.3d at 666 & n.258. “As a result” of systemic discrimination and the disparities in education, employment, housing, and transportation, the district court found that “Hispanics and African-Americans make up a disproportionate number of people living in poverty, and thus have little real choice when it comes to spending money on anything that is not a necessity.” Id. at 636 (footnote omitted).
Importantly, the district court also found that “[t]hese socioeconomic disparities have hindered the ability of African-Americans and Hispanics to effectively participate in the political process. Dr. An-solabehere testified that these minorities register and turn[]out for elections at rates that lag far behind Anglo voters.”[56] Id. at 697. This is significant because the inquiry in Section 2 cases is whether the vestiges of discrimination act in concert with the challenged law to impede minority participation in the political process. See League of United Latin Am. Citizens, Council No. 4434 v. Clements, 999 F.2d 831, 866-67 (5th Cir. 1993) (en banc). The district court concluded in the affirmative, and the State does not contest these underlying factual findings on appeal.
The district court ultimately found:
SB 14’s voter ID requirements interact with social and historical conditions in Texas to cause an inequality in the electoral opportunities enjoyed by African-Americans and Hispanic voters as compared to Anglo voters. In other words, SB 11 does not disproportionately impact AJricanr-Americans and Hispanics by mere chance. Rather, it does so by its interaction with the vestiges of past and current racial discrimination.
Veasey v. Perry, 71 F.Supp.3d at 698 (emphasis added).
Again, the State does not dispute the underlying data or methodologies. Instead, the State objects that the district court must have found some evidence that SB 14 directly caused a reduction in turnout. The State insists that the district court erred by failing to ask whether SB 14 causes a racial voting disparity, rather than a disparity in voter ID possession. We have never required such a showing. Section 2 asks whether a standard, practice, or procedure results in “a denial or abridgement of the right ... to vote.” 52 U.S.C. § 10301(a). Abridgement is defined as “[t]he reduction or diminution of something,” Abridgement, Black’s Law DictionaRY (10th ed. 2014), while the Voting Rights Act defines “vote” to include “all action necessary to make a vote effective *260 including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted.” 52 U.S.C. § 10101(e). The district court’s finding that SB 14 abridges the right to vote by causing a racial disparity in voter ID possession falls comfortably within this definition. Our case law dictates the same outcome. See Operation Push, 932 F.2d at 409, 413 (affirming the district court’s finding that a voter registration law violated Section 2 when it resulted in a 25% difference in the registration rates between eligible black and white voters); see also Chisom, 501 U.S. at 408, 111 S.Ct. 2354 (Scalia, J., dissenting) (“If, for example, a county permitted voter registration for only three hours one day a week, and that made it more difficult for blacks to register than whites, blacks would have less opportunity ‘to participate in the political process’ than whites, and [Section] 2 would therefore be violated ....”).
For the same reason, we decline to require a showing of lower turnout to prove a Section 2 violation. An election law may keep some voters from going to the polls, but in the same election, turnout by different voters might increase for some other reason. See Veasey v. Perry, 71 F.Supp.3d at 655 (discussing the effect of President Obama’s candidacy on voter turnout). That does not mean the voters kept away were any less disenfranchised. Requiring a showing of lower turnout also presents problems for pre-election challenges to voting laws, when no such data is yet available. More fundamentally, no authority supports requiring a showing of lower turnout, since abridgement of the right to vote is prohibited along with denial. U.S. Const. amend. XV; 52 U.S.C. § 10301(a). Illuminating this last point is the State’s answer at oral argument to a question about whether its proposed Section 2 effects test would prohibit literacy tests (if they were not otherwise specifically prohibited) from being imposed as a condition for voting.[57] The State contended that literacy tests “would almost certainly” be struck down under its proposed Section 2 effects test — but only if plaintiffs could show a resulting “denial of equal opportunity,” i.e., a “voter turnout disparity.”[58]
*261 We decline to cripple the Voting Rights Act by using the State’s proposed analysis. Doing so would unmoor the Voting Rights Act from its history and decades of well-established interpretations about its protections. See Allen, 393 U.S. at 565, 89 S.Ct. 817 (“The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race.”); Chisom, 501 U.S. at 406, 111 S.Ct. 2354 (Scalia, J., dissenting) (“This new ‘results’ criterion [from the 1982 amendments to the Voting Rights Act] provides a powerful, albeit sometimes blunt, weapon with which to attack even the most subtle forms of discrimination.”). Instead, we will adhere to the Supreme Court’s instruction to examine challenged laws and' practices in an intensely fact-based and local totality-of-the-circumstances analysis. See Gingles, 478 U.S. at 36-38, 79, 106 S.Ct. 2752.
Thus, while evidence of decreased turnout is relevant, it is not required to prove a Section 2 claim of vote denial or abridgement. In this case, the record contains evidence that minority voters generally turn out in lower numbers than non-minority voters and that State-sponsored discrimination created socioeconomic disparities, which hinder minority voters’ general participation in the political process. Accordingly, the district court did not clearly err in determining that the impact of past and current discrimination on minorities in Texas favors finding that SB 14 has a discriminatory effect under Section 2.
(d) Gingles Factor 6: Racial Appeals in Political Campaigns
While the existence of racial appeals in political campaigns is a factor that may be indicative of a law’s disparate impact, see Gingles, 478 U.S. at 40, 106 S.Ct. 2752, it is not highly probative here (and racial appeals seem to have been used by both minorities and non-minorities). The district court found that such appeals still exist in Texas and cited anecdotal evidence to support its finding. See Veasey v. Perry, 71 F.Supp.3d at 638-39. While we do not overturn the underlying factual finding, we do not agree that such anecdotal evidence of racial campaign appeals shows that SB 14 denies or abridges the right to vote.
(e) Gingles Factor 7 and Factor 8: Minority Public Officials and Responsiveness to Minority Needs
The extent to which minority candidates are elected to public office also contextualizes the degree to which vestiges of discrimination continue to reduce minority participation in the political process. See Gingles, 478 U.S. at 45, 106 S.Ct. 2752. The district court found that African Americans comprise 13.3% of the population in Texas, but only 1.7% of all Texas elected officials are African American. Veasey v. Perry, 71 F.Supp.3d at 638. Similarly, Hispanics comprise 30.3% of the population but hold only 7.1% of all elected positions. Id. Within the Texas Legislature, however, both groups fare better— African Americans hold 11.1% of seats in the Legislature while Hispanics hold 21.1% of seats. Id. Again, the State does not contest these findings. Id.
The district court also found that Texas’s history of discrimination, coupled with SB 14’s effect on minorities in Texas and the Legislature’s response to ameliorative amendments, demonstrated a lack of responsiveness to minority needs by elected officials. See Gingles, 478 U.S. at 45, 106 S.Ct. 2752. The evidence supports the dis *262 trict court’s finding that “the legislature knew that minorities would be most affected by the voter ID law.” Veasey v. Perry, 71 F.Supp.3d at 657-58. For instance, Representative Todd Smith, a proponent of the legislation, stated that it was “common sense” the law would have a disproportionate effect on minorities. See id. at 657. Similarly, Bryan Hebert, Deputy General Counsel in the Office of the Lieutenant Governor and author of some of the provisions of SB 14, warned that SB 14 was unlikely to obtain (the now-defunct) pre-clearance under the Voting Rights Act without further forms of permissible ID. Id. at 658.
The district court noted that minority legislators and constituents testified about the likely disparate impact of SB 14, yet their amendments to ameliorate that impact were rejected without explanation. See id. at 651, 658, 669, 698, 702. These included amendments to expand the forms of acceptable ID to include student IDs, federal IDs, state-government employee IDs, measures to fund education and training related to the law, and indigency exceptions.[59] Id. at 658, 708-10. While this does not necessarily prove improper intent on the part of thosé legislators, it nonetheless supports a conclusion of lack of responsiveness.[60]
(f) Gingles Factor 9: Tenuousness of Policies Underlying the Law
The district court concluded that the policies underlying SB 14’s passage were only tenuously related to the State’s interests in preventing fraud and increasing voter confidence in elections. We do not deny that the State’s articulated objectives are legitimate state interests, as the Supreme Court has made clear. See Crawford, 553 U.S. at 191, 128 S.Ct. 1610. Yet, the articulation of a legitimate interest is not a magic incantation a state can utter to avoid a finding of disparate impact. Even under the least searching standard of review we employ for these types of challenges, there cannot be a total disconnect between the State’s announced interests and the statute enacted. See St. Joseph Abbey v. Castille, 712 F.3d 215, 225-26 (5th Cir. 2013) (holding there was an impermissible “disconnect” between the state’s expressed interests and the challenged regulations and noting that “[t]he great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption!,] nor does it require courts to accept nonsensical explanations [from the state]”); cf. Inclusive Cmtys. Project, Inc. v. Tex. Dep’t of Hous. & Cmty. Affairs, 747 F.3d 275, 282 (5th Cir. 2014) (permitting a plaintiff to prevail on disparate impact claim under the Fair Housing Act where he “prov[es] that the [state’s] substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect”), aff'd, — U.S. ——, 135 S.Ct. 2507, 192 L.Ed.2d 514 (2015). The Court in Gin-gles and the Senate that passed the 1982 Amendments to the Voting Rights Act acknowledged as much by including tenuousness among the factors to be considered. See Gingles, 478 U.S. at 45, 106 S.Ct. 2752. Along with elected officials’ lack of responsiveness to minority needs, a tenuous fit between the expressed policy and the provisions of the law bolsters the conclusion that minorities are not able to equally *263 participate in the political process. Otherwise, elected officials would be more responsive regarding the disparate impact of a law, and a law not meaningfully related to its expressed purpose would be abandoned or ameliorated to avoid imposing a disparate impact, given the preexisting socioeconomic and political disadvantages caused by past and present discrimination.
The district court found that “the stated policies behind SB 14 are only tenuously related to its provisions.” Veasey v. Perry, 71 F.Supp.3d at 698. The State is entitled to make policy choices about when and how it will address various priorities. But in this case, the provisions of SB 14 fail to correspond in any meaningful way to the legitimate interests the State claims to have been advancing through SB 14. For example, the Legislature claimed to model its law after those from Indiana, Georgia, Wisconsin, and other states that included many more forms of acceptable identification, plus indigency exceptions and far more extensive educational campaigns. Yet, the Legislature rejected many ameliorative amendments that would have brought SB 14 in line with those states’ voter ID laws. See id. at 643, 658. The option of mail-in voting also showcases the dubious connection between the State’s interests and SB 14’s provisions. In order to prevent voter fraud, the State has pushed more vulnerable elderly voters away from in-person voting — a form of voting with little proven incidence of fraud — and toward mail-in voting, which the record shows is far more vulnerable to fraud, particularly among the elderly. Id. at 639-41, 653. In fact, SB 14 does nothing to address the far more prevalent issue of fraudulent absentee ballots. Id. at 641.
The district court likewise found that the Legislature’s expressed concerns about undocumented immigrants and noncitizens voting were misplaced. It credited testimony that undocumented immigrants are unlikely to vote as they try to avoid contact with government agents for fear of being deported. Id. at 654. At least one Representative who voted for SB 14 conceded that he had no evidence to substantiate his fear of undocumented immigrants voting. Id. Additionally, the district court found that SB 14 would not prevent noncitizens from voting, since noncitizens can legally obtain a Texas driver’s license or concealed handgun license, two forms of SB 14 ID. Id. at 654-55.
The district court also found “no credible evidence” to support assertions that voter turnout was low due to a lack of confidence in elections, that SB 14 would increase public confidence in elections, or that increased confidence would boost voter turnout. Id. at 655. Two State Senators and the Director of the Elections Division at the Texas "Secretary of State’s office were all unaware of anyone abstaining from voting out of concern for voter fraud, and the Director testified that implementing SB 14’s provisional ballot process might actually undermine voter confidence. Id.
Rather, the district court credited testimony that SB 14 would decrease voter turnout. Id. at 655-56. According to a well-established formula employed by political scientists to assess individuals’ likelihood of voting in an election, increasing the cost of voting decreases voter turnout — particularly among low-income individuals, as they are most cost sensitive. Id. at 656. Further, the district court dismissed the argument that increased turnout during the 2008 presidential election was demonstrative of increased voter confidence in two states that had recently passed voter ID laws. Id. at 655. Instead, it found that the increased turnout, which occurred nationwide, was due to President Obama’s candidacy. Id. Finally, the court also found that *264 public opinion polls — which found high levels of support for photo ID requirements— were not demonstrative that SB 14 itself would promote voter confidence. Id. at 656. The district court discounted the polls because they did not evaluate whether voters supported SB 14 itself rather than some other form of voter ID law when weighed against SB 14’s exceedingly burdensome requirements and attendant effect on minority voters. Id.
(g) Discriminatory Effect Conclusion
In light of its findings regarding SB 14’s disparate impact, and its application of the Gingles factors, the district court held that SB 14 acted in concert with current and historical conditions of discrimination to diminish African Americans’ and Hispanics’ ability to participate in the political process. Id. at 695-98. We conclude that the district court performed the “intensely local appraisal” required by Gingles, 478 U.S. at 79, 106 S.Ct. 2752. The district court clearly delineated each step of its analysis, finding that:
(1) SB 14 specifically burdens Texans living in poverty, who are less likely to possess qualified photo ID, are less able to get it, and may not otherwise need it; (2) a disproportionate number of Texans living in poverty are African-Americans and Hispanics; and (3) African-Americans and Hispanics are more likely than Anglos to be living in poverty because they continue to bear the socioeconomic effects caused by decades of racial discrimination.
Veasey v. Perry, 71 F.Supp.3d at 664.
The district court thoroughly evaluated the “totality of the circumstances,” each finding was well-supported, and the State has failed to contest many of the underlying factual findings. Furthermore, the district court’s analysis comports with the Supreme Court’s recent instruction that “a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant’s policy or policies causing that disparity.”[61] Inclusive Communities, 135 S.Ct. at 2523. The district court here acknowledged this principle and tethered its holding to two findings. First, the court found a stark, racial disparity between those who possess or have access to SB 14 ID, and those who do not. Second, it applied the Gingles factors to conclude that SB 14 worked in concert with Texas’s legacy of state-sponsored dis *265 crimination to bring about this disproportionate result.
We note that, because the district court’s findings link Texas’s state-sponsored history of discrimination to the conditions affecting minority voters in Texas today, we need not and do not decide whether proof of such state-sponsored discrimination is required under the second part of this analysis. Cf. Frank, 768 F.3d at 755 (reasoning that the discrimination affecting minorities should be linked to the state under the second part of the two-part analysis). The evidence in this record suffices to meet even this higher standard as enunciated in Frank. Id.
We conclude that the district court did not clearly err in determining that SB 14 has a discriminatory effect on minorities’ voting rights in violation of Section 2 of the Voting Rights Act. As discussed below, we remand for a consideration of the appropriate remedy in light of the impending general election.
III. First and Fourteenth Amendment Burden on the Right to Vote
Plaintiffs argue that SB 14 also unconstitutionally burdens their right to vote, as forbidden by the First and Fourteenth Amendments. We decline to decide this question, under the “well established principle governing the prudent exercise of this [c]ourt’s jurisdiction that normally th[is c]ourt will not decide a constitutional question if there is some other ground upon which to dispose of the ease.” Escambia Cty. v. McMillan, 466 U.S. 48, 51, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984). Since the majority of the court affirms the district court’s determination that SB 14 has a discriminatory effect under Section 2 of the Voting Rights Act, Plaintiffs will be entitled to the same relief they could access if they prevailed on these First and Fourteenth Amendment claims. See Ketchum v. Byrne, 740 F.2d 1398, 1409-10 (7th Cir. 1984) (“There appears to be no difference in the practical result or in the available remedy regardless of how the resulting discrimination is characterized. We therefore shall not explicitly decide the issue of a fourteenth amendment violation .... ”); cf. Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 205-06, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009). Put another way, the rights and remedies are intertwined.
Accordingly, it is unnecessary for the en banc court to address this issue, and we need not and do not decide whether SB 14 violates the First and Fourteenth Amendments by placing an unconstitutional burden on the right to vote. See Merced v. Kasson, 577 F.3d 578, 586-87 (5th Cir. 2009); Jordan v. City of Greenwood, 711 F.2d 667, 668-70 (5th Cir. 1983) (quoting Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944)). We therefore vacate the district court’s determination on this issue and dismiss Plaintiffs’ First and Fourteenth Amendment claims.
IV. Poll Tax
The Veasey Plaintiffs[62] originally alleged that SB 14 imposed , a poll tax in violation of the Fourteenth and Twenty-Fourth Amendments. After the passage of SB 983, the Veasey Plaintiffs filed a Rule 28(j) Letter with this court, stating that “SB14, as amended by SB983, is no longer a poll tax.” The Veasey Plaintiffs nevertheless contend that “the poll tax issue is still *266 alive” because SB 14 operated as a poll tax for nearly two years, preventing Plaintiffs and others from voting, and because it will-take a “long time” for Texas voters to “learn about and acquire free birth certificates.” Additionally, even without the $2 to $3 fee, the Veasey Plaintiffs argue that the process of obtaining a free birth certificate and a free EIC constitutes the kind of “burdensome alternative process” that was struck down in Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965). Before our full court, the Veasey Plaintiffs continue to argue that we should affirm the district court’s poll tax ruling.
To the extent that the Veasey Plaintiffs have not abandoned or conceded this claim,[63] we conclude that SB 14, as amended by SB 983, does not impose a poll tax. Although SB 983 was passed when this case was already on appeal, we do not need to remand this issue to the district court for two reasons: (1) we conclude that even before SB 983, SB 14 did not create a facial poll tax; and (2) the issue of SB 983’s impact on the poll tax issue is a pure question of law (at least as far as this facial challenge) that does not necessitate any reweighing of evidence or consideration of new evidence.
The Veasey. Plaintiffs previously facially challenged SB 14 with respect to Texas voters born out of state (who are unaffected by SB 983’s passage). Those voters could face fees in their state of birth to obtain documentation required for an EIC. We conclude that SB 14 does not facially impose a poll tax on those voters. Rather, SB 14 requires all Texas voters to present valid identification at the polls, exercising the State’s “legitimate interest in assessing the eligibility and qualifications of voters.” Gonzalez v. Arizona, 677 F.3d 383, 408-10 (9th Cir. 2012) (en banc); see also Harper v. Va. Bd. of Elections, 383 U.S. 663, 668, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (“But we must remember that the interest of the State, when it comes to voting, is limited to the power to fix qualifications.”). The indirect cost on voters born out of state does not constitute a poll tax.[64] Cf. Harman, 380 U.S. at 541, 85 S.Ct. 1177 (“Thus, in order to demonstrate the invalidity of [the challenged law], it need only be shown that it imposes a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax.” (emphasis added)).
Likewise, SB 14 did not impose a poll tax on voters before the passage of SB 983. It did not “impose[] a material requirement solely upon those who refuse[d]” to pay a poll tax, as proscribed by the Twenty-Fourth Amendment. Id. at 541-42, 85 S.Ct. 1177. Rather, it drew from the State’s power to set voter qualifications by requiring all voters to present a valid form of photo identification at- the polls. See Gonzalez, 677 F.3d at 408. Under the Fourteenth Amendment, as the Supreme Court interpreted it in Harper, the Court has observed that a state invidiously discriminates when it imposes a cost to vote with a justification that is “irrelevant to the voter’s qualifications.” Crawford, 553 U.S. at 189, 128 S.Ct. 1610. Although *267 the questions presented to the Supreme Court in Crawford did not include whether Indiana’s voter ID law imposed a poll tax, the Court observed that a statute would be invalid under Harpers, Fourteenth-Amendment poll tax analysis “if the State required voters to pay a tax or a fee to obtain a new photo identification.” 553 U.S. at 198, 128 S.Ct. 1610 (emphasis added). The Court implied that requiring voters to obtain photo identification and charging a fee for the required underlying documentation would not qualify as a poll tax, and we similarly conclude that SB 14’s similar requirements did not operate as a poll tax. See id. at 198 & n.17, 128 S.Ct. 1610; see also Gonzalez, 677 F.3d at 407-10.
As amended by SB 983, Texas law no longer imposes any direct fee for the underlying documentation required to obtain a qualifying voter ID. What remain are the requirements that such voters travel to the local registrar or county clerk’s office, gather and present certain forms of documentation to receive the certified record, travel to the DPS office with that record, and present the certified record, along with two forms of supporting identification, to receive an EIC. See 37 Tex. Admin. Code § 15.182(3)—(4). The Veasey Plaintiffs appear to argue in their Rule 28(j) Letter that these obligations make SB 14 unconstitutional under Harman because they “requir[e] voters to follow a burdensome alternative process to avoid paying a ... poll tax.”[65]
To the extent the Veasey Plaintiffs now attempt to analogize SB 14 and SB 983 to the scheme in Harman, we reject that analogy. In Harman, the state of Virginia forced those who would vote in federal elections to choose between paying a poll tax and meeting a registration requirement before each election year. 380 U.S. at 531-32, 85 S.Ct. 1177. The Virginia constitution mandated that federal voters file a certificate of residence within a specific date range, beginning on October 1 of the year before the federal election at issue and ending on a date six months before the date of the federal election. Id. at 532, 85 S.Ct. 1177. On a notarized, witnessed certificate, the federal voter had to submit a current address and attest to: (1) being a resident of Virginia, both at the time of submission and since the date of voter registration, and (2) an intent not to move from the city or county of residence before the next general election. Id. Those voters who chose to pay federal and state poll taxes were only required to file the certificate of residence one time; those who did not pay the federal poll tax had to file a new certificate of residence in the designated time frame before each election year. Id.
Here, the State does not offer Texas voters a choice between paying a fee and undergoing an onerous procedural process. Cf. id. at 540-41, 85 S.Ct. 1177. All voters must make a trip to the DPS, local registrar, county clerk, or other government agency at some point to receive qualifying photo identification. This record reveals that Plaintiffs and those who lack both SB 14 ID and underlying documentation face more difficulty than many Texas voters in obtaining SB 14 ID. Undoubtedly, those who own vehicles, have flexible work schedules, and already possess the required documentation can more easily meet these procedural requirements than some of the Plaintiffs and others who lack these resources. Plaintiffs and others simi *268 larly situated often struggle to gather the required documentation, make travel arrangements and obtain time off from work to travel to the county clerk or local registrar, and then to the DPS, all to receive an EIC. These greater difficulties receive consideration in the Section 2 discriminatory effect analysis, but Supreme Court jurisprudence has not equated these difficulties, standing alone, to a poll tax. See, e.g., Harper, 383 U.S. at 666, 86 S.Ct. 1079. In Harman, the Court specifically noted:
[I]t is important to emphasize that the question presented is not whether it would be within a State’s power to abolish entirely the poll tax and require all voters — state and federal — to file annually a certificate of residence. Rather, the issue here is whether the State of Virginia may constitutionally confront the federal voter with a requirement that he either pay the customary poll taxes as required for state elections or file a certificate of residence.
380 U.S. at 538, 85 S.Ct. 1177; see also Crawford, 553 U.S. at 198-99, 128 S.Ct. 1610 (contrasting the unconstitutionality of a requirement that voters “pay a tax or a fee to obtain a new photo identification” with a requirement that voters without ID “travel to the circuit court clerk’s office within 10 days [of the election] to execute the required affidavit”). Additionally, whether the qualifying identification is a driver’s license, passport, or EIC, voters need not undergo this process every election year during a specific time frame six months prior to the election, as was the case in Harman. Instead, the record indicates that an EIC remains valid for six years and must only be obtained sometime before an election.
In light of the recently-enacted SB 983, SB 14 does not impose an unconstitutional poll tax under the Fourteenth or Twenty-Fourth Amendments, nor did it impose a poll tax before SB 983’s enactment. Accordingly, we vacate the district court’s judgment for the Veasey Plaintiffs on their poll tax claim and render judgment in the State’s favor.
V. Remedy
After finding that SB 14 was enacted with a racially discriminatory purpose, the district court fully enjoined SB 14’s implementation, with the exception of several sections of the law that do not relate to photo identification. See Veasey v. Perry, 71 F.Supp.3d at 707 & n.583. That remedy is potentially broader than the one to which Plaintiffs would be entitled if only the discriminatory effect claim were considered. Compare Crawford, 553 U.S. at 200, 203, 128 S.Ct. 1610 (noting, in the Section 2 context, that “petitioners have not demonstrated that the proper remedy — even assuming an unjustified burden on some voters — would be to invalidate the entire statute”), with City of Richmond, 422 U.S. at 378, 95 S.Ct. 2296 (holding, in the discriminatory purpose context, that “[a]n official action ... taken for the purpose of discriminating ... on account of ... race has no legitimacy at all”), and Washington v. Seattle Sch. Dist. No. 1, 458 U.S. 457, 465-66, 471, 487, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) (affirming the permanent injunction of a statewide initiative because its provisions were “effectively drawn for racial purposes” in violation of the Fourteenth Amendment).[66]
*269 As discussed above, we (and, correspondingly, the district court) are acting within a short timeframe during which the district court will have to fashion at least an interim remedy relevant to the November 2016 election. Thus, we consider it prudent to provide some guidance regarding what would constitute a properly tailored remedy.
“When devising a remedy to a [Section] 2 violation, the district court’s ‘first and foremost obligation ... is to correct the Section 2 violation.’ ” Brown, 561 F.3d at 435 (quoting Bone Shirt v. Hazeltine, 461 F.3d 1011, 1022 (8th Cir. 2006)). Yet, any remedy “should be sufficiently tailored to the circumstances giving rise to the [Section] 2 violation,” id., and to the extent possible, courts should respect a legislature’s policy objectives when crafting a remedy, see Perez, 132 S.Ct. at 940-44; see also Inclusive Communities, 135 S.Ct. at 2524 (“Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice that ‘arbitrarily] ... operate[s] invidiously to discriminate on the basis of rac[e].’” (citation omitted)). In the context of redistricting,[67] the Supreme Court has instructed that a legislature’s policy objectives may be discerned from the challenged legislation, and those policy choices should be respected, even when some aspect of the underlying law is unenforceable. Perez, 132 S.Ct. at 941.
When a statute contains a sever-ability clause, courts must take special care to attempt to honor a legislature’s policy choice to leave the statute intact. See Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 330-31, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (holding that lower courts should not have invalidated the entire statute, but should have accounted for the legislature’s policy choices and the statute’s severability clause). In this case, SB 14’s severability clause makes clear that the Legislature intended the photo identification system to be left intact for all valid applications.[68] Also clearly underlying SB 14 is the concern that a voter present proper identification that cannot easily be counterfeited or used by another.
There are times when a court might give a state legislature an opportunity to cure the infirmities in the statute before permitting the district court to fashion a remedy. See Wise v. Lipscomb, 437 U.S. 535, 540, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978) (“When a federal court declares an exist *270 ing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan.” (emphasis added)); Operation Push, 932 F.2d at 404-06 (affirming the district court after it initially issued orders requiring legislative action and then deferred to the Mississippi legislature’s crafted remedy in accordance with those orders); Westwego Citizens for Better Gov’t v. City of Westwego, 946 F.2d 1109, 1124 (5th Cir. 1991). Indeed, when feasible, our practice has been to “offer governing bodies the first pass at devising” remedies for Voting Rights Act violations. Brown, 561 F.3d at 435. Based on suggestions in oral argument, appropriate amendments might include a reasonable impediment or indi-gency exception similar to those adopted, respectively, in North Carolina[69] or Indiana.[70] There may also be some portion of prior state law that can reduce the discriminatory effect SB 14 has on minority voters without proper identification.
However, the Supreme Court and our court have acknowledged that when it is not practicable to permit a legislative body this opportunity because of an impending election, “it becomes the ‘unwelcome obligation’ of the federal court to devise and impose a [remedy] pending later legislative action.” Wise, 437 U.S. at 540, 98 S.Ct. 2493 (quoting Connor v. Finch, 431 U.S. 407, 415, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977)); see also Perez, 132 S.Ct. at 939-41 (implicitly approving of a district court’s decision to devise an interim redistricting plan rather than permit the legislature to impose a new plan in light of the fast-approaching election, but remanding to the district court to alter the plan to reflect the State’s policy judgments); Reynolds v. Sims, 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (“[0]nee a State’s legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan.”); cf. Planned Parenthood Cincinnati Region v. Taft, 444 F.3d 502, 517 (6th Cir. 2006) (remanding'to the district court to fashion an appropriate injunction and instructing the district court to account for legislative intent).
Such circumstances are present here: the Texas Legislature is not scheduled to be in session again until January 2017, and the November 2016 general election is fast approaching. It would be untenable to permit a law with a discriminatory effect to remain in operation for that election.[71] In fact, the State has not asked us to permit the Legislature to reconsider SB 14 before the courts fashion a remedy and, despite filing multiple briefs with this court in this case before and after the panel opinion, the State has never argued that we must defer to the Legislature in the first instance. When counsel for the State was asked about this issue during oral argument before our full court, counsel responded that so long as it was a “tailored, specific remedy,” he “believefs] this court could fashion the remedy itself.” Upon further pressing by a member of the court, the State noted it also would be proper for the state legislature to act first, but re *271 peated that this court could enact a tailored remedy and did not advocate that this court could or should order the Texas Governor to call a special session of the Legislature to craft a remedy to any Section 2 violation.
Because of the Supreme Court’s order and the impending election, we would necessarily have to give only limited time for any legislative fix. Since the legislature is not scheduled to be in session this year, doing so would require that the Texas Governor call a special session of the Legislature. Accordingly, although legislative intercession may occur, it may not be feasible, and we follow the Supreme Court’s guidance and permit the district court to enter an order that remedies SB 14’s discriminatory effects. See Wise, 437 U.S. at 540, 98 S.Ct. 2493; see also Perez, 132 S.Ct. at 939-41.
In the event that the Governor calls a special session to address this issue or should a later Legislature again address the issue of voter identification, any new law would present a new circumstance not addressed here. Such a new law may cure the deficiencies addressed in this opinion. Neither our ruling here nor any ruling of the district court on remand should prevent the Legislature from acting to ameliorate the issues raised in this opinion. Any concerns about a new bill would be the subject of a new appeal for another day.
On remand, the district court should refer to the policies underlying SB 14 in fashioning a remedy. We acknowledge that the record establishes that the vast majority of eligible voters possess SB 14 ID, and we do not disturb SB 14’s effect on those voters — those who have SB 14 ID must show it to vote. The remedy must be tailored to rectify only the discriminatory effect on those voters who do not have SB 14 ID or are unable to reasonably obtain such identification. See Frank II, 819 F.3d at 386 (rejecting that “because some voters face undue difficulties in obtaining acceptable photo IDs, Wisconsin could not require any voter to present a photo ID,” but accepting that “high hurdles for some persons” might “entitle those particular persons to relief’). Because the parties had an opportunity to present the evidence they desired during the initial district court proceedings, the district court’s determinations should be based on the current record, supplemented only by legislative action, if any, that occurs after this remand and any oral argument permitted by the district court.
Clearly, the Legislature wished to reduce the risk of in-person voter fraud by strengthening the forms of identification presented for voting. Simply reverting to the system in place before SB 14’s passage would not fully respect these policy choices — it would allow voters to cast ballots after presenting less secure forms of identification like utility bills, bank statements, or paychecks. See Tex. Elec. Code § 63.001(b) (West 2010). The panel opinion noted that one possibility would be to reinstate voter registration cards as documents that qualify as acceptable identification under the Texas Election Code for those individuals who do not have and cannot reasonably obtain SB 14 ID.[72] During oral argument, counsel for the State suggested that an indigency exception, modeled after the exception in Indiana’s voter ID law, would be sufficient to cure the discriminatory effect of SB 14. These are solutions the district court may consider. Further, in fashioning a remedy, the district court should also consider the ne *272 cessity of educational and training efforts to ensure that both voters and workers at polling places are capable of making use of whatever remedy the district court selects.
In light of the impending election, we order the district court to file its order regarding the proper discriminatory effect remedy as soon as possible. The parties have expressed a willingness to work cooperatively with the district court to provide a prompt resolution of this matter, and we urge them to do so to avoid election eve uncertainties and emergencies.
VI. Conclusion

A. Discriminatory Purpose Claim

For the reasons stated above, we REVERSE the district court’s judgment that SB 14 was passed with a racially discriminatory purpose and REMAND for the district court to consider this claim in light of the guidance we have provided in this opinion. As we have discussed, to avoid disruption of the upcoming election, the district court should first focus on fashioning interim relief for the discriminatory effect violation in the months leading up to the November general election. The district court should then reevaluate the evidence relevant to discriminatory intent and determine anew whether the Legislature acted with a discriminatory intent in enacting SB 14. We encourage the district court to wait until after the November 2016 election to make this new determination. However, whether the district court waits to make its findings until after the November election or does so sooner, we instruct that, in light of the limited time prior to the November 2016 election, the district court shall not implement any remedy arising from such reevaluation before this November’s election.

B. Discriminatory Effect Claim

We AFFIRM the district court’s finding that SB 14 violates Section 2 of the Voting Rights Act through its discriminatory effects and REMAND for consideration of the appropriate remedy consistent with this opinion as soon as possible. The district court must ensure that any remedy enacted ameliorates SB 14’s discriminatory effect, while respecting the Legislature’s stated objective to safeguard the integrity of elections by requiring more secure forms of voter identification.

C. Other Claims

We VACATE the district court’s holding that SB 14 is a poll tax under the Fourteenth and Twenty-Fourth Amendments and RENDER judgment for the State on this issue. We need not and do not address whether SB 14 unconstitutionally burdens the right to vote under the First and Fourteenth Amendments; therefore, we VACATE the district court’s judgment on that issue and DISMISS those claims.

D. Interim Relief

In sum, the district court’s immediate responsibility is to ensure the implementation of an interim remedy for SB 14’s discriminatory effect that disrupts voter identification rules for the 2016 election season as little as possible, yet eliminates the Section 2 discriminatory effect violation. The district court will need to reexamine the discriminatory purpose claim in accordance with the proper legal standards we have described, bearing in mind the effect any interim legislative action taken with respect to SB 14 may have. The district court’s task in this respect may await the November 8, 2016 general election.

. Part II.A. 1 as written represents the opinion of a plurality of the court. However, a majority of the court agrees that there are infirmities in the district court’s opinion regarding Plaintiffs’ discriminatory purpose claim, requiring reversal of the district court’s judgment that SB 14 was passed with a racially discriminatory purpose. A majority of the court also agrees that, given the court’s decision to reverse the district court’s judgment as to this claim, the court should remand to the district court with instructions to reweigh the evidence in light of this opinion.

. We refer to these required forms of identification under SB 14 as “SB 14 ID.”

.SB 14 also requires the name on the photo ID to be "substantially similar” to the voter’s registered name. Tex. Elec. Code § 63.001(c) (West Supp. 2014). If the names are not identical but are substantially similar, the voter must sign an affidavit that the voter and the registered voter are one and the same. Id. If the names are not substantially similar, the voter may submit a provisional ballot and within six days must go to the county registrar with additional ID to verify his or her identity. Id. §§ 63.001(g), 63.011, 65.0541(a) (West Supp. 2014).

. Among the forms of supporting identification are: voter registration cards, school records, insurance policies that are at least two years old, identification cards or driver’s licenses issued by another state that have not been expired for more than two years, Texas vehicle or boat titles or registrations, military records, Social Security cards, W-2 forms, expired Texas driver’s licenses, government agency ID cards, unexpired military dependent identification cards, Texas or federal parole or mandatory release forms, federal inmate ID cards, Medicare or Medicaid cards, immunization records, tribal membership cards from federally recognized tribes, and Veteran’s Administration cards. 37 Tex. Admin. Code § 15.182(4).

. The Department of State Health Services ("DSHS”) waived most of the fees for obtaining a birth certificate to get an EIC, but this provision separately required the Bureau of Vital Statistics, local registrars, and county clerks to collect a $2 fee for the issuance of a certified copy of a birth certificate, and permitted local registrars and county clerks to impose an additional $1 fee. Tex. Health & Safety Code § 191.0045(d), (e), (h) (West 2010).

. The district court also found that one-quarter of the '$2 million was earmarked to research what type of voter education was needed. Veasey v. Perry, 71 F.Supp.3d at 649.

. A three-judge district court declined to grant judicial preclearance to override the United States Attorney General’s denial of preclearance. See Texas v. Holder, 888 F.Supp.2d 113, 144-45 (D.D.C. 2012), vacated and remanded, - U.S. -, 133 S.Ct. 2886, 186 L.Ed.2d 930 (2013). The Supreme Court vacated and remanded this decision when it issued Shelby County v. Holder, - U.S. -, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013), which held unconstitutional the coverage formula in Section 4(b) used to determine which jurisdictions were subject to the preclearance requirement in Section 5 of the Voting Rights Act. Thereafter, Texas began enforcing SB 14.

. Plaintiff-Intervenor Texas League of Young Voters Education Fund (the “Texas League’’) was non-operational when the panel opinion was issued and remained so at least at the time the supplemental en banc briefs were filed in this case. "A claim becomes moot when ‘the parties lack a legally cognizable interest in the outcome.’ " Nat’l Rifle Ass'n of Am., Inc. v. McCraw, 719 F.3d 338, 344 n.3 (5th Cir. 2013) (quoting Powell v. McCormack, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). The Texas League argues that it nonetheless has standing because many of the Texas voters whose inability to obtain SB 14 ID gave rise to the Texas League's standing remain disenfranchised by SB 14. Because other Plaintiffs have standing to challenge SB 14 and because the court's remedy will reach all voters who do not have or cannot reasonably obtain SB 14 ID (regardless of their membership in the Texas League), we need not separately address the Texas League’s standing. See Nat’l Rifle Ass’n, 719 F.3d at 344 n.3 (“Only one of the petitioners needs to have standing to permit us to consider the petition for review.”).

. The district court did not enjoin enforcement of sections 16, 23, and 24 in accordance with SB 14’s severability clause. Sections 16 and 23 relate to increasing the penalties and offense levels for election code violations. See Tex. Elec. Code § 64.012 historical note (West 2010 & Supp. 2014) [Act of May 16, 2011, 82d Leg., R.S., ch. 123, §§ 16, 23, 2011 Tex. Gen. Laws 619, 623, 625]. Section 24 has expired, but once related to the purposes for which the voter registrars could use certain funds disbursed under the election code. See Act of May 16, 2011, 82d Leg., R.S., ch. 123, § 24, 2011 Tex. Gen. Laws 619.

. The parties also filed Rule 28(j) letters before the panel that initially heard this case. The parties noted the passage of SB 1934, effective on September 1, 2015, which provides that state-issued identification cards issued to individuals age 60 and older expire on a date to be specified by DPS. Act of May 29, 2015, 84th Leg., R.S., S.B. 1934 (codified as an amendment to Tex. Transp. Code § 521.101(f)(1)). Before this new law, ID cards for those 60 and older did not expire. 37 Tex. Admin. Code § 15.30. While Plaintiffs contended before the panel initially considering this case that SB 1934 will exacerbate the discriminatory effect of SB 14, the State insisted SB 1934 was passed merely to comply with the federal REAL ID Act. See 6 C.F.R. § 37.5(a). The panel opinion concluded that this issue is not yet ripe for Our review. See Texas v. United States, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (“A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.” (citation omitted)). The parties have not raised this issue again before our full court.

. One of the dissenting opinions suggests that the majority opinion flouts the canon of constitutional avoidance by reaching the discriminatory purpose claim. We recognize the canon of constitutional avoidance, and where possible, we have avoided reaching constitutional claims unnecessarily, see infra Parts III and IV. However, we cannot avoid ruling on the discriminatory intent claim here, where the remedy to which Plaintiffs would be entitled for a discriminatory intent violation is potentially broader than the remedy the district court may fashion for the discriminatory impact violation. See City of Richmond v. United States, 422 U.S. 358, 378, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975) (holding, in the discriminatory purpose context, that "[a]n official action ... taken for the purpose of discriminating ... on account of ... race has no legitimacy at'all”).

. The State argues that, instead of applying the Arlington Heights standard, we should apply a "clearest proof” standard grafted from cases involving the determination of whether a legislature meant to impose criminal punishment through a civil law when the law faces an ex post facto challenge. See, e.g., Smith v. Doe, 538 U.S. 84, 92-93, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003); Kansas v. Hendricks, 521 U.S. 346, 360-61, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997); Flemming v. Nestor, 363 U.S. 603, 613, 617-20, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). In those cases, courts deferred to legislatures’ categorizations of laws as "civil” except upon "the clearest proof” that the laws were "so punitive either in purpose or effect as to negate” the "civil” label. Hendricks, 521 U.S. at 361, 117 S.Ct. 2072 (citation omitted). The Supreme Court has not applied this standard in the voting rights context. See generally Arlington Heights, 429 U.S. 252, 97 S.Ct. 555; Hunter, 471 U.S. 222, 105 S.Ct. 1916; cf. Pers. Adm’r of Mass. v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); Lodge v. Buxton, 639 F.2d 1358 (5th Cir. Unit B Mar. 1981). Instead, we have noted that discriminatory intent in this context may be shown through circumstantial evidence, as discriminatory motives are often "cleverly cloaked in the guise of propriety.” Lodge, 639 F.2d at 1363. We decline to apply the State’s proposed standard in this context.

. Neither Arlington Heights nor our decision in Price, 945 F.2d 1307, requires direct evidence. The district court here allowed extensive discovery of legislative materials which did not yield a "smoking gun.” The district court could have found, but was not required to find, that this lack of a smoking gun supports the State’s position here. That was the situation that we addressed in Price, and in that case we found no clear error in the district court’s decisions about what evidence to credit. As the district court explained here, SB 14's proponents knew at the time that SB 14 would be subject to the preclearance requirement, Veasey v. Perry, 71 F.Supp.3d at 658, 701, so the lack of a smoking gun is not surprising. The latter point makes it even more important that Price noted direct evidence would be stronger than circumstantial evidence, but only ”[t]o the extent that the justifications advanced in [legislators’] testimonies] do not demonstrate a pretext for intentionally discriminatory actions.” Price, 945 F.2d at 1318. As we note herein, we conclude there is evidence that could support a finding that the Legislature’s justification of ballot integrity was pretextual in relation to the specific, stringent provisions of SB 14.

. "Relatively recent" does not mean immediately contemporaneous. Shelby County emphasized that "things have changed” since the 1965 passage of the Voting Rights Act, 133 S.Ct. at 2625, but it did not articulate a particular time limit, see id. at 2625-27. Nor do we. Suffice it to say the closer in time, the greater the relevance, while always recognizing that history (even "long-ago history”) provides context to modern-day events.

. Nonetheless, as discussed infra, the Court's conclusion in LULAC that Texas's 2003 redistricting plan violated the Voting Rights Act does evidence a history of discrimination that is relevant to our discriminatory effect analysis, because historical instances of discrimination continue-to produce socioeconomic conditions that the district court found contributed to the racial disparities in ID possession.

. The relevance of this evidence apparently rests partially upon the unsupported premise that a legislator concerned about border security or opposed to the entry into Texas of undocumented immigrants is also necessarily *234 in favor of suppressing voting by American citizens of color.

. Here, the problematic evidence is the speculation and conclusions of the opposing legislators. We are not suggesting that the bill opponents lack credibility because they are opposing legislators, as credibility is a question for the trier of fact. Testimony found to be credible from opponents of the bill about conduct and statements by proponents would be highly probative. Our point is simply that speculation and conclusory accusations by opposing legislators are not an appropriate foundation for a finding of purposeful discrimination.

. In the different but somewhat analogous realm of employment discrimination, we have similarly rejected the plaintiff's testimony that he or she believed that the motivation of his or her employer was racial or other discrimination. See Byers v. Dall. Morning News, Inc., 209 F.3d 419, 426-27 (5th Cir. 2000).

. In fact, in this case, there is evidence that the proponents of SB 14 were careful about what they said and wrote about the purposes of SB 14, knowing it would be challenged during the preclearance process under the Voting Rights Act. Senator Fraser, one of the authors of SB 14, admitted during his deposition that he believed “that the public legislative record would either go to the Department of Justice or a three-judge panel as part of the [Voting Rights Act] Section 5 review process,” and that he was therefore "aware that everything that [he] was saying was part of a public record.” The Deputy General Counsel to the Lieutenant Governor, Bryan Hebert, testified that he sent an email "urgfing] senators to emphasize the detection and deterrence of fraud and protectfing] public confidence in elections” as "the goal” of SB 14, "to remind people what the point of the bill was” for their speeches on the floor of the Texas Senate.

. Of course, employment discrimination cases are not directly supportive, but they are analogous. One of the dissenting opinions points out that the intent of the Legislature differs from that of an employer because a legislature's intent is "a pastiche of each individual representative's views, mixed policies and motives.” Jones Dissenting Op. at 283 n.5. But while each legislator casts his or her own vote, these votes are often cast in blocs and along party lines. Recognition that legislatures, just as employers, may articulate pre-textual reasons for discriminatory actions is not a superficial equation, but rather a realistic acknowledgment.

. Representative Todd Smith, a proponent of the legislation, stated that it was "common sense” the law would have a disproportionate effect on minorities. Veasey v. Perry, 71 F.Supp.3d at 657. Similarly, Bryan Hebert, Deputy General Counsel in the Office of the Lieutenant Governor, acknowledged that the poor and minorities were most likely to be affected by SB 14. Id. Without additional forms of identification, Hebert warned that SB 14 was unlikely to obtain (the now-defunct) preclearance under Section 5 of the Voting Rights Act. Id. at 658.

.One of the dissenting opinions calls into question the rationale behind these maneuvers and draws different interpretations and inferences from the evidence. However, it is the exclusive province of the district court to engage in this fact finding. Pullman-Standard, 456 U.S. at 291-92, 102 S.Ct. 1781. We acknowledge that multiple inferences could reasonably be drawn from the record' evidence, but we must leave the drawing of those inferences to the district court. Additionally, one of the dissenting opinions disagrees with reliance on opposing legislators’ factual testimony about the unusual nature of the procedural maneuvers utilized to pass SB 14. There is a clear difference between opposing legislators testifying about their personal knowledge regarding the normal procedural sequence of passing legislation and opposing legislators merely speculating about the motives of SB 14’s proponents.

. The Texas Governor also has the power to call special sessions of the Legislature, which are topically limited to the confines of the proclamation summoning the Legislature. Tex. Const, art. IV, § 8.

. Representative Fischer testified that the Legislature had access to data from the 2008 and 2010 elections when considering SB 14, which showed that "of the millions of votes *239 cast in both of those elections, there were perhaps four referrals for in person voter impersonation" and that "one, if not two individuals ... had been officially charged and may .have accepted responsibility for impersonation.”

. This statement is not intended as a criticism of allowing mail-in ballots, which are a vital means of enabling voting when it would otherwise be difficult or impossible for some people to exercise their right to vote in person. It is simply an acknowledgement that the evidence supporting the need for reform was minimal on the in-person voting side.

. One of the dissenting opinions claims that “the Indiana and Texas laws are not meaningfully different.” Jones Dissenting Op. at 296 n.26. This ignores the district court’s findings and the obvious differences between the two laws that affect the discriminatory impact analysis. The district court explained the differences well:
Notably, while Defendants claim that SB 14 was modeled after the Indiana law, the Indiana law is more generous to voters. Unlike SB 14, it permits the use of any Indiana state-issued or federal ID and contains a nursing home resident exemption. Furthermore, Indiana is more generous in its acceptance of certain expired ID.' Of particular relevance here, Indiana's accommodation of indigents, while requiring an additional trip to the county election office tó claim an exemption, does not require an indigent to actually obtain, or pay any fees associated with, a qualified photo ID. This is significant, as demonstrated in this case. There was also a reference in Crawford, to a “greater public awareness” of the law, which would prompt voters to secure qualified ID, as opposed to a relative dearth of publicity and instruction in Texas.
Veasey v. Perry, 71 F.Supp.3d at 679 (footnotes omitted) (citing Ind. Code § 3-5-2-40.5(a)(3) (2014), Ind. Code § 3-11.7-5-2.5 (2011), and Crawford, 553 U.S. at 187-88 & n.6, 128 S.Ct. 1610). The'district court specifically found that the Texas Legislature stripped an indigency exception from SB 14, id. at 652, and that "[w]hen the legislature rejected student IDs, state government employee IDs, and federal IDs, they rejected IDs that are disproportionately held by African-Americans and Hispanics,” id. at 658. These differences are highly salient to the discriminatory impact analysis.

. The law in question was enacted in 1975, after a previous re-registration requirement was struck down as unconstitutional in the early 1970s. A three-judge court eventually .struck down this attempt at purging and reregistration after the Department of Justice objected to the law when Texas became subject to preclearance. See generally Veasey v. Perry, 71 F.Supp.3d at 635 & n.18.

. In LULAC, the Supreme Court also noted Texas’s “long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process.” LULAC, 548 U.S. at 439, 126 S.Ct. 2594 (quoting Vera v. Richards, 861 F.Supp. 1304, 1317 (S.D. Tex. 1994)). The . Court found that Texas’s 2003 redistricting plan diluted the Hispanic vote in one district such that it violated the Voting Rights Act. Although the Court did not find that Texas had acted with discriminatory intent, it noted:
The changes to District 23 undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive .... In essence the State took away the Latinos' opportunity because Latinos were about to exercise it. This bears the mark of intentional discrimination that could give rise to an equal protection violation. Even if we accept the District Court’s finding that the State’s action was taken primarily for political, not racial, reasons, the redrawing of the district lines was damaging to the Latinos in District 23. The State not only made fruitless the Latinos’ mobilization efforts but also acted against those Latinos who were becoming most politically active, dividing them with a district line through the middle of Laredo.
Id. at 439-40, 126 S.Ct. 2594 (citations omitted).

.One of the dissenting opinions quarrels with the district court’s findings on this issue, but a three-judge panel reviewing Texas’s 1981 redistricting plan reached the same conclusion:
In 1975, Congress extended the special pre-clearance provisions of the Voting Rights Act of 1965 to Texas. This decision was made on the basis of extensive hearings into the history of voting discrimination in the state. Since the pre-clearance provisions were extended to Texas in August of 1975, the Department of Justice has lodged far more objections to governmental actions affecting voting rights in Texas than any other covered state. Between August 15, 1975, and September 18, 1981, the State and its various political sub-divisions received 91 letters of objection. In this same period, no other covered state had more than 50 objections, and only three had more than thirty. The election changes objected to by the Department of Justice include the movement of polling places, proposed annexations, alteration of district lines, and a state-wide purge of voter registration lists.
Seamon v. Upham, 536 F.Supp. 931, 989 (E.D. Tex.) (citations omitted), vacated on other grounds, 456 U.S. 37, 102 S.Ct 1518, 71 L.Ed.2d 725 (1982).

. This partisan motive to suppress votes is not based on which party is in the majority. When asked about the fact that most redistricting and discriminatory laws were enacted under legislatures with a majority who were members of a different party than the current majority, the Plaintiffs' expert, Dr. Burton, agreed. He testified that this fact made his analysis "stronger because it does not matter who is in charge of State politics or the political parties in power in Texas, whether they’re Republicans, Democrats!,] or Martians, every time that African-Americans have, in fact, been perceived to be increasing their ability to vote and participate in the process there has been State legislation to either deny them the vote or at least dilute the vote or make it much more difficult for them to participate on an equal basis as Whites in the State of Texas.”
One of the dissenting opinions claims that we confuse partisanship for racism in our analysis of whether the Legislature acted with a discriminatory intent. Intentions to achieve partisan gain and to racially discriminate are not mutually exclusive. As another of the dissenting opinions points out, acting to preserve legislative power in a partisan manner can also be impermissibly discriminatory. Ketchum v. Byrne, 740 F.2d 1398, 1408 (7th Cir. 1984) (noting that "racial discrimination [may be and has been a] necessary accompaniment of [an] action taken to protect incumbencies”). In this case, the district court found that the party in power in the Texas Legislature faced "a declining voter base and [stood to] gain partisan advantage by suppressing the ... votes of African-Americans and Latinos.” See Veasey v. Perry, 71 F.Supp.3d at 700. Once again, the disagreement centers in part on the fact that some of the dissenting opinions would re-weigh the evidence and disregard the district court’s fact findings, which we are riot entitled to do. See Pullman-Standard, 456 U.S. at 292, 102 S.Ct. 1781.

. Two of the dissenting opinions take issue with our decision on discriminatory intent, in part because this issue can be fraught and divisive. One of the dissenting opinions claims that Congress intended to prevent such divisiveness by ensuring that plaintiffs could sue for discriminatory impact. Congress amended the Voting Rights Act in 19.82 to make it clear *242 that plaintiffs could sue for discriminatory impact after Supreme Court precedent had required the showing of a discriminatory purpose under Section 2. See S. Rep. No. 97-417, at 15-16 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 192-93. Congress acted in the face of this precedent to make it easier for minority plaintiffs to combat discriminatory laws — not to make it more difficult. Congress did not eliminate plaintiffs’ ability to sue for purposeful discrimination, so it remains our duty to consider these claims. See S. Rep. No. 97-417, at 17 (1982), as reprinted in 1982 U.S.C.C.A.N. 177, 194 & n.50 (emphasis in original) (citation omitted) (noting that Section 2 was originally understood by Congress to prohibit “any kind of practice ... if its purpose or effect was to deny or abridge the right to vote on account of race or color”). In this case, although we must tread carefully in assessing the motives of the Legislature and the district court may very well agree with some of the points made by the dissenting opinions, we must be mindful of our role in this process. We are not the court to make factual findings in the first instance, and the record evidence could support more than one conclusion. We must therefore remand for reweighing of the evidence, rather than conducting that reweighing ourselves. See Pullman-Standard, 456 U.S. at 291, 102 S.Ct. 1781 ("When an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law ... there should be a remand for further proceedings to permit the trial court to make the missing findings ...." (emphasis added)); N. Miss. Commc'ns, Inc. v. Jones, 951 F.2d 652, 656-57 (5th Cir. 1992) (citing Pullman-Standard, 456 U.S. at 291, 102 S.Ct. 1781) (remanding a case, for the fourth time, for factual findings under the proper standard).

. Section 2 provides in full:
(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
52 U.S.C. § 10301. We address more fully below how the factors adopted by the Supreme Court in Gingles and the other standards we apply effectuate the language of Section 2.

. These are sometimes also called the "Senate Factors,” as they derive from the Senate Report accompanying the 1982 amendments to the Voting Rights Act. See Gingles, 478 U.S. at 43-45, 106 S.Ct. 2752.

. See, e.g., League of United Latin Am. Citizens, Council No. 4434 v. Clements, 999 F.2d 831, 850-51 (5th. Cir. 1993) (en banc); Salas v. Sw. Tex. Junior Coll. Dist., 964 F.2d 1542, 1543, 1546, 1551-56 (5th Cir. 1992).

. See League of Women Voters, 769 F.3d at 240, 245 (noting the Gingles factors are useful in examining both elements of the two-part test, especially the causal linkage between disparate impacts and conditions of discrimination); Husted, 768 F.3d at 554 (noting the Gingles factors form part of the totality of the circumstances analysis in examining a claim of vote denial, "particularly with regard to the second element” of the two-part test).

. See also In re Am. Int'l Refinery, Inc., 676 F.3d 455, 462 (5th Cir. 2012) (rejecting a per se approach in favor of a “totality of the circumstances approach for deciding whether third-party payment of a retainer creates a disqualifying interest” in a bankruptcy case); United States v. Jenson, 462 F.3d 399, 406 (5th Cir. 2006) (employing a multi-factor test to determine whether consent to search was voluntary); Cleveland v. City of Elmendorf, 388 F.3d 522, 528 (5th Cir. 2004) (employing a totality-of-the-circumstances analysis to determine whether workers were volunteers for the purposes of the Fair Labor Standards Act); Brown & Root, Inc. v. NLRB, 333 F.3d 628, 634 (5th Cir. 2003) (applying a totality- *247 of-the-circumstances analysis to determine whether an employer made an unlawful threat related to union activity); United States v. Rodriguez-Rivas, 151 F.3d 377, 380-81 (5th Cir. 1998) (employing a totality-of-the-circumstances analysis to determine whether a Border Patrol agent had reasonable suspicion to stop a vehicle); United States v. Jon-T Chems., Inc., 768 F.2d 686, 694 (5th Cir. 1985) (looking "to the totality of the circumstances” in a "heavily fact-specific” inquiry regarding whether a subsidiary was the alter ego of its parent); Gonzales v. Beto, 460 F.2d 314, 315 (5th Cir. 1972) (judging a lineup by the totality of the circumstances to determine whether it violated due process).

. These arguments also address the discomfort expressed by some of the dissenting opinions with how the Gingles factors are applied differently in different cases. As we have noted, the factors are highly fact dependent, as they must be to address different laws, different states with varying histories of official discrimination, and different populations of minority voters.. Such has also been the case with the variances in decisions among the circuit courts to consider challenges to voter ID laws — our decision differs from those of other circuits in part because we are considering "the [strictest [l]aw in the [c]ountry” in a State with a fairly extensive history of official discrimination. See Veasey v. Perry, 71 F.Supp.3d at 642; cf. Frank, 768 F.3d at 746 (noting that Wisconsin’s law allowed the use of state ID cards," recent naturalization papers, tribal IDs, and signed college or university photo IDs); Common Cause/Georgia v. Billups, 554 F.3d 1340, 1346 (11th Cir. 2009) (noting that Georgia’s law allowed the use of "a government employee identification card, a U.S. military identification card, or a tribal identification card”); Gonzalez v. Arizona, No. CV 06-1268-PHX, 2006 WL 3627297, at *6 (D. Ariz. Sept. 11, 2006) (describing a wide variety of acceptable forms of identification accepted at Arizona polls), aff'd, 485 F.3d 1041 (9th Cir. 2007).
Even so, the fact-dependent nature of the Gingles factors does not mean that "[v]irtually any voter regulation” may be struck down under our analysis. See Jones Dissenting Op. at 310. Undoubtedly, challenges to election laws under Section 2 have increased since Shelby County as states have enacted new laws and regulations that must be challenged under Section 2, if at all, because these laws no longer face preclearance. That does not mean that our analysis endangers neutral, nondiscriminatory election laws. As we explain infra, district courts considering these challenges have come to different conclusions based on varying fact patterns and election laws, not always with the result of striking down election laws. Indeed, the United States abandoned its Section 2 discriminatory-effect challenge to a voter ID law after the North Carolina legislature added a reasonable impediment exception to the law. See N.C. State Conference of the NAACP v. McCrory, - F. Supp. 3d -, -, No. 1:13CV658, 2016 WL 1650774, at *16 (M.D.N.C. Apr. 25, 2016).

. Furthermore, Wisconsin’s law, considered in Frank, allows for more forms of identification than does SB 14. The district court found SB 14 to be the "[sjtrictest [l]aw in the [cjountry” based on comparisons to other states’ voter ID laws and on the characterization of SB 14 by one of its drafters. Veasey v. Perry, 71 F.Supp.3d at 642-43, 701 & n.542.

. One of the dissenting opinions relies heavily on Crawford in discussing both discriminatory purpose and impact, essentially using Crawford's endorsement of "preventing voter fraud” as a talisman against objections that SB 14 does not appear even remotely well tailored to suit its stated purposes. While we acknowledge the State’s legitimate interests in this case, Crawford did not deal with either discriminatory intent or effect under Section 2. In Crawford, the Court simply noted the weight of the State’s interests in the First and Fourteenth Amendment balancing analysis, which differs from Section 2's inquiries into discriminatory motive and impact. As noted infra, even Judge Easterbrook and the Seventh Circuit do not subscribe to the dissenting opinions’ views of Crawford's or Frank’s holdings. We likewise decline to read into Crawford the inapposite principle that the State may invidiously discriminate or impermissi-bly disparately burden minorities so long as it articulates "preventing voter fraud” as one purpose of a restrictive law.

. Specifically, the Seventh Circuit noted the distinction between the general facial challenge in Frank and the more particular as-applied challenge in Frank IF.
The argument plaintiffs now present is different. Instead of saying that inconvenience for some voters means that no one needs photo ID, plaintiffs contend that high hurdles for some persons eligible to vote entitle those particular persons to relief. Plaintiffs' approach is potentially sound if even a single person eligible to vote is unable to get acceptable photo ID with reasonable effort. The right to vote is personal and is not defeated by the fact that 99% of other people can secure the necessary credentials easily. Plaintiffs now accept the propriety of requiring photo ID from persons who already have or can get it with reasonable effort, while endeavoring to protect the voting rights of those who encounter high hurdles. This is compatible with our opinion and mandate, just as it is compatible with Crawford.
Frank II, 819 F.3d at 386-87 (emphasis added).

, One of the dissenting opinions proposes a different analysis to apply in Section 2 “results” cases. This opinion asserts that the test should be "simple and consistent,” meaning that we should ignore the Supreme Court’s guidance in Gingles, Congress's intention as expressed in the Senate Factors, and, in practice, that we should require outright denial of *250 the right to vote to show a Section 2 violation. Jones Dissenting Op. at 254. Unfortunately, assessing whether a law has a discriminatory impact is no simple matter and does not lend itself to simple formulations. As we have shown, neither do many other fact-dependent tests that we routinely apply in other contexts. We must undertake this difficult work, even if the analytical frameworks best suited to the task are not as neat and tidy as we would prefer. See Clements, 999 F.2d at 860 (noting that standards in Section 2 cases "must reflect the central purpose of the Voting Rights Act and its intended liberality as well as the practical difficulties of proof in the real world of trial,” especially since "greater certitude frequently may be purchased only at the expense of other values”).

. While the State's expert criticized this calculation, he conceded that the methodology used to derive this figure was well accepted. Nonetheless, he attempted to challenge the No-Match List because 21,731 people on the No-Match List later voted in the spring 2014 election. We accept the well-reasoned logic of the district court, which noted that some of those 21,731 who voted may have done so by mail, which does not require SB 14 ID, while others may have obtained SB 14 ID between the calculation of the No-Match List and the spring 2014 election. Veasey v. Perry, 71 F.Supp.3d at 660.

. We recognize that the terms used to describe different racial or ethnic groups inoffensively can themselves be the subject of dispute. Where we quote a witness or the district court or where we discuss a witness’s testimony, we use their terms. For our part, because we are a reviewing court, while recognizing the imperfections of these terms, we use the terms used by the district court and the parties to refer to the three groups that were the subject of the evidence in this case: Anglos (used to describe non-Hispanic Caucasians), Hispanics, and African Americans. We also recognize that many Texans identify with more than one racial or ethnic group and some Texans do not fall into any of these three groups; we address the evidence and arguments as they were presented by the parties.

. Before the panel, the State attacked the entirety of the district court's findings on the grounds that the lower court did not distinguish between SB 14’s statutory provisions and the Department of Public Safety's implementing regulations. Although an issue raised for the first time on appeal, like this one, is waived, Fruge v. Amerisure Mut. Ins. Co., 663 F.3d 743, 747 (5th Cir. 2011), this argument likewise fails on the merits. The State’s proposed rule of law would contradict both Gin-gles's demand that courts take a "functional view of the political process” in assessing Section 2 claims, 478 U.S. at 45, 48 n.15, 106 S.Ct. 2752, and Section 2’s language itself, which proscribes voting practices "imposed or applied” such that they produce a discriminatory result, 52 U.S.C. § 10301(a). Moreover, we have previously affirmed a district court's finding of discriminatory impact where the district court found the law delegated too much discretion to local officials. See Operation Push, 932 F.2d at 404.

. Other challenges brought by the State include its argument that that the analyses relied upon by the district court are unreliable because one source of data — the State’s voter registration database — does not list the race or ethnicity of voters. The State contends that Plaintiffs' expert should have relied instead on data provided by the Department of Public Safety (“DPS”). The district court rightly rejected this argument. The DPS database did not allow registrants to identify themselves as "Hispanic” until May 2010. As the Texas Director of Elections conceded, the number of Hispanic registered voters is "exponentially higher” than the DPS records would suggest. We cannot fault the district court for refusing to rely on inaccurate data, particularly in light of the State’s failure to maintain accurate data.
Additionally, the State suggests that conveying the disparity in ID possession in comparative percentages is misleading. See Frank, 768 F.3d at 755 n.3 (stating that purveying data as a comparative percentage is a "misuse” that “produces a number of little relevance to the problem”). Instead, the State believes a less deceptive method is to state that 2% of Anglo, 5.9% of Hispanic, and 8.1% of African-American registered voters lack SB 14 ID. Even assuming the State is correct, conveying the disparities in the way the State suggests does not change the analysis. The district court did not err in concluding that SB 14 disproportionately impacts Hispanic and African-American voters.
Finally, the State argues for the first time on appeal that there is no disparate impact where, as here, the gross number of Anglos without SB 14 ID — 296,156 people — almost totals the number of African-American, Hispanic, and "other” voters without SB 14 ID— 312,314 people. Courts have never required the gross number of affected minority voters to exceed the gross number of affected Anglo voters. See, e.g., League of Women Voters, 769 F.3d at 233; see also Frank, 768 F.3d at 753-54 (comparing the percentage of minority voters without qualifying ID to the percentage of Anglos without such ID). We decline to address this argument raised for the first time on appeal. See Leverette v. Louisville Ladder Co., 183 F.3d 339, 341-42 (5th Cir. 1999).

. These problematic predictions included inquiries like: "What types of candidates have white and minority voters supported together in the past and will those trends continue?” Strickland, 556 U.S. at 17, 129 S.Ct. 1231.

. Additionally, we note that this court and many others have upheld the constitutional validity of the Section 2 results test. See, e.g., Bush v. Vera, 517 U.S. at 990-91, 116 S.Ct. 1941 (O'Connor, J., concurring) (collecting cases assuming Section 2’s constitutionality); Jones, 727 F.2d at 373-74; United States v. Blaine Cty., 363 F.3d 897, 904-05 (9th Cir. 2004) (holding that the court remains bound to the Supreme Court’s prior affirmance of Section 2's constitutionality and noting that “when the Supreme Court first announced the congruence-and-proportionality doctrine in City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), it twice pointed to the [Voting Rights Act] as the model for appropriate prophylactic legislation” and that the Supreme Court continues to rely on the Voting Rights Act as the baseline for congruent and proportional legislation); Johnson v. Hamrick, 196 F.3d 1216, 1219. n.3 (11th Cir. 1999) (reaffirming the constitutionality of Section 2). We previously held that “[c]ongressional power to adopt prophylactic measures to vindicate the purposes of the fourteenth and fifteenth Amendments is unquestioned” and "[o]n those occasions when the Court has stricken enactments as exceeding congressional power under the enforcement clauses of the fourteenth or fifteenth amendments, the congressional objective has usually deviated from the central purposes of those amendments — to ensure black equality.” Jones, 727 F.2d at 373-74 (citations omitted). Section 2, as applied here, does not deviate from that purpose, and Jones still •binds us. Cf. Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).

. SB 14 exempts certain disabled persons from its photo ID requirements, if they submit an application to be exempted with written documentation, including: (1) "a statement in a form prescribed by the secretary of state that the applicant does not have a form of identification acceptable” under SB 14's codified provision, Tex. Elec. Code § 63.0101, and (2) documentation from either "the United States Social Security Administration evidencing the applicant has been determined to have a disability,” or documentation "from the United States Department of Veterans Affairs evidencing the applicant has a disability rating of at least 50 percent.” Tex. Elec. Code § 13.002(1). The district court found that Plaintiffs Carrier, Espinosa, Mendez, and Taylor "may qualify for SB 14's disability exemption,” but that "[t]hese Plaintiffs were not made aware of this exemption when they went to DPS or other relevant offices” and that "[a]s of January 15, 2014, only 18 voters were granted a disability exemption in Texas.” Veasey v. Perry, 71 F.Supp.3d at 674 (citing Tex. Elec. Code § 13.002(1)). This fact evidences the increased burden SB 14 places on Plaintiffs and others on the No-Match List because of the lack of funding devoted to educating voters. Although this is not an overwhelming burden in and of itself, the requirement and poor implementation provide one more obstacle for disabled plaintiffs to clear in attempting to vote in person without SB 14 ID. In this case, some of the Plaintiffs who could have used this exception were turned away at the polls and were never made aware of it.

. Before the panel that initially heard this case, the State made an even bolder claim— that the Plaintiffs "failed to show that SB 14 prevented a single person from voting.” This claim is demonstrably false, as the experiences of Plaintiffs Floyd Carrier and Sammie Louise Bates show, see infra.

. We do not opine on the effect, under Section 2, of other possible absentee balloting arrangements, only on the inadequacy of mail-in voting in these circumstances to mitigate or eliminate the discriminatory impact of SB 14.

. For example, mail-in voting requires obtaining and submitting a correctly filled-out and signed application to the early voting clerk in the voter’s county “on or before the 18th day before election day,” Tex. Elec. Code § 86.008(a), plus receiving an absentee ballot by mail, filling out the ballot correctly, and ensuring the proper state party receives the ballot on or before election day, id. §§ 86.004-.007, 86.008(b).

. These lackluster efforts stand in stark contrast to those of other states whose voter ID laws have thus far passed Section 2 scrutiny. See, e.g., N.C. State Conference of the NAACP v. McCrory, — F. 3d -, ---, No. 1:13CV658, 2016 WL 1650774, at *19-20 (M.D.N.C. Apr. 25, 2016) (cataloging the myriad educational efforts of North Carolina, including: education at three elections before the law went into effect; having voters sign a ledger if they lacked required ID; targeted mailings and outreach to those voters and over 200,000 others on North Carolina's no-match list; pre-paid return mailers to obtain assistance for voters lacking required ID; and further updated advertisement, targeted mailing, and outreach after a reasonable impediment exception was enacted); Common Cause/Ga. v. Billups, 504 F.Supp.2d 1333, 1378-79 (N.D. Ga. 2007) (holding that the state of Georgia’s educational efforts were crucial to whether Georgia’s voter ID law unduly burdened voters, that the court initially granted a preliminary injunction in part due to lack of notice and education, and finding that voters had since been educated after Georgia ran advertisements and directly contacted voters who potentially lacked valid IDs to inform them about how to get valid ID or vote absentee), vacated in part on other grounds, 554 F.3d 1340 (11th Cir. 2009). Contrary to the State’s hyperbolic predictions, these different outcomes show the importance of the fact-bound Section 2 analysis we employ here. It has resulted in the approval of laws less burdensome and less discriminatory in effect than SB 14, while it holds the State of Texas accountable for the strictest and perhaps most poorly implemented voter ID law in the country. See, e.g., Veasey v. Perry, 71 F.Supp.3d at 667-69, 676 (noting the many problems with the implementation of SB 14).

. The district court cited many examples of Texas’s long history of state-sponsored discrimination. See Veasey v. Perry, 71 F.Supp.3d at 633-36. Less recent examples include all-white primary elections that persisted from 1895 to 1944 despite the Supreme Court attempting to curb the practice in 1927, literacy and secret ballot restrictions that persisted until struck down in 1970, and poll taxes that were eventually struck down in 1966. Id. at 633-35. When the poll tax was made unconstitutional in 1964 by the Twenty-Fourth Amendment, Texas attempted to separate federal and state ballots, so that the State could still impose a poll tax for state ballots. That effort never succeeded because it was struck down as unconstitutional after the Voting Rights Act was passed and applied to Texas. Eventually, Texas ratified the Twenty-Fourth Amendment in 2009. In the wake of Texas’s inability to retain poll taxes, the district court found that Texas passed a voter re-registration requirement in 1966 that persisted in the form of purging the voter rolls after re-registration was ruled unconstitutional in the early 1970s. Id. at 635. Ultimately, the purging practice was enjoined under the preclearance portions of the Voting Rights Act. Id. While long-ago history of discrimination is of limited probative value when considering whether the Legislature acted with discriminatory intent, it cannot be ignored in the discriminatory effect analysis, because even these seemingly remote instances of State-sponsored discrimination continue to produce socioeconomic conditions that the district court found caused the racial disparities in possession of SB 14 ID.

. Of course, the preclearance analysis differs from the Section 2 discriminatory effect analysis. The State had the burden to show it should receive preclearance in Texas v. Holder, whereas the Plaintiffs have the burden to show a discriminatory effect in the analysis we employ here. Cf. Texas v. Holder, 888 F.Supp.2d 113, 117 (D.D.C. 2012) (noting that the preclearance analysis places the burden on the State to prove that a law does not have " ‘the effect of denying or abridging the right to vote on account of race’ — i.e. ... a retrogressive effect”), vacated and remanded on other grounds, - U.S. -, 133 S.Ct. 2886, 186 L.Ed.2d 930 (2013). One of the dissenting opinions seeks to discredit this case because it was vacated after Shelby County was decided. However, the opinion was not vacated on the merits and remains factually relevant as a contemporary example of State-sponsored *258 discrimination based on the finding of a three-judge federal court.

. For the first time in its reply brief before the panel that initially heard this case, the State argued that the district court erred by examining whether race and voting patterns exhibited a correlated, rather than causal, link. We generally do not consider arguments raised for the first time in a reply brief. See Baris v. Sulpicio Lines, 932 F.2d 1540, 1546 n.9 (5th Cir. 1991). The State has not renewed this argument before our full court and we will not consider it.

. According to Dr. Ansolabehere’s expert report, 83 to 87% of Anglos of voting age and 84 to 88% of Anglo citizens of voting age in Texas are registered to vote, compared to 65 to 77% of Blacks of voting age and 75 to 80% of Black citizens of voting age, and 50 to 55% of Hispanics of voting age and 75 to 80% of Hispanic citizens of voting age. Likewise, 41.8% of Anglos voted in 2010 compared to 31.3% of Blacks and 22% of Hispanics. In 2012, 64.3% of registered Anglos voted, compared to 45% of registered Blacks and 59.8% of registered Hispanics.

. In full, the exchange between a member of our court at the en banc oral argument and the State’s counsel follows:
JUDGE: "[I]f literacy tests weren't separately prohibited, would a literacy test be invalidated by your proposed equal treatment test?”
STATE'S COUNSEL: "Insofar as literacy tests, you know, first of all, that would obviously be separately banned under — "
JUDGE: "Beside[s] the separate ban.”
STATE'S COUNSEL: “I — I believe insofar as you're putting aside the separate banning, and insofar as you're putting aside a purpose claim, I think you would still ask, 'is this a denial of equal opportunity?' And in that scenario you’d have to show a prima facie case, and it would almost certainly, in the relevant jurisdictions that we’re talking about, have been able to show a voter turnout disparity, ah, particularly, you know, Operation Push v. Mabus would have been another case like this where you had legacy systems in place, and under those legacy systems, there would have been liability.”

. One of the dissenting opinions would require a showing of decreased turnout to prevail on a discriminatory effect claim. This argument is unsupported by case law and ignores the following points. First, such an approach would foreclose the ability to file pre-enforcement challenges, which are particularly important now that preclearance is not required. As the concurring opinion acknowledges, the Supreme Court suggested in Shelby County that courts could "block voting laws from going into effect” through injunctive relief under Section 2. See Shelby Cty., 133 S.Ct. at 2619. Second, turnout itself does not answer the question of a particular voter being denied access: turnout of certain people might increase while turnout of others decreases, leaving overall turnout the same; yet, those denied the right to vote are still disenfranchised. Third, this argument also con *261 flates abridgement and denial: in previous times, some people paid the poll tax or passed the literacy test and therefore voted, but their rights were still abridged.

. The indigency exception was part of SB 14 when it passed the Senate, but was stripped from the bill in the Texas House. Veasey v. Perry, 71 F.Supp.3d at 652.

. This distinction is akin to the difference between negligence and intent.

. Some of the dissenting opinions argue that the majority opinion holds the Legislature "liable for racial disparities [it] did not create” by failing to show that the statistical disparity in ID possession among different races is caused by a State policy, as opposed to socioeconomic and historical conditions. In fact, as discussed above, the district court found that SB 14 creates a racial disparity by requiring the use of certain IDs to vote that minorities disproportionately lack. Certainly the passage of SB 14 did not cause fewer minorities to possess certain IDs (like driver's licenses or concealed handgun licenses). Rather, the district court found that socioeconomic and historical conditions contributed to this disparity in ID possession, which demonstrates why historical evidence of racism is relevant to the Section 2 analysis. But SB 14 itself caused minorities to disproportionately lack the documentation that is required to vote by dictating that the documents and IDs required would be those that minorities disproportionately lack. We cannot ignore that in passing SB 14, the Legislature carefully selected the types of IDs that would be required to vote. In doing so, the Legislature selected IDs that minorities disproportionately do not possess and excluded IDs that minorities possess in greater numbers, without providing sufficient justification for those choices. The fact that this occurred on a landscape where minorities are less likely to possess certain forms of ID or be able to obtain those IDs, at least in part as a result of past instances of State-sponsored discrimination, does not absolve the Legislature of responsibility. Accordingly, the district court's conclusion that SB 14 created racial disparities in the possession of IDs required to vote is supported by the record.’

. The Veasey Plaintiffs include: Marc Veas-ey, Jane Hamilton, Sergio Deleon, Floyd Carrier, Anna Burns, Michael Montez Penny Pope, Oscar Ortiz, Koby Ozias, League of United Latin American Citizens, John Mellor-Crummey, Ken Gandy, Gordon Benjamin, and Evelyn Brickner. No other plaintiff joined in making this allegation.

. Cf. Ray v. United Parcel Serv., 587 Fed.Appx. 182, 186 (5th Cir. 2014) (noting plaintiff "affirmatively abandoned [his Title VII] claim on appeal by conceding” that he had not established pretext for racial discrimination).

. Only one plaintiff, Ken Gandy, showed that he was unable to obtain an out-of-state birth certificate due to its cost, see Veasey v. Perry, 71 F.Supp.3d at 671, but he was able to vote by mail, id. at 677. Accordingly, Ken Gandy has suffered no injury that we must address under the poll tax rubric, and we conclude that SB 14 is not a poll tax as applied to him.

. This is somewhat in tension with the Veas-ey Plaintiffs' initial briefing before the panel, which claimed SB 14 was a poll tax based on the fee involved and conceded that "incidental burdens on voters are not taxes,” including ''[incidental costs such as paying for gas to drive to the polls.”

. We do not mean to suggest that a full injunction is never available as a remedy for a discriminatory effect finding. However, given the severability clause in this statute and the Supreme Court’s cautions to give deference to legislative determinations even when some violation is found, the district court must examine a full range of potential remedies. Perez, 132 S.Ct. at 941.

. We have held that Section 2 redistricting cases provide an appropriate source of guidance for district courts attempting to craft remedies for Section 2 voter registration violations. See Operation Push, 932 F.2d at 406. Likewise, we take guidance here from precedent regarding the proper remedies for Voting Rights Act violations.

. The severability clause reads:
Every provision in this Act and every application of the provisions in this Act are severable from each other. If any application of any provision in this Act to any person or group of persons or circumstances is found by a court to be invalid, the remainder of this Act and the application of the Act’s provisions to all other persons and circumstances may not be affected. All constitutionally valid applications of this Act shall be severed from any applications that a court finds to be invalid, leaving the valid applications in force, because it is the legislature’s intent and priority that the valid applications be allowed to stand alone. Even if a reviewing court finds a provision of this Act invalid in a large or substantial fraction of relevant cases, the remaining valid applications shall be severed and allowed to remain in force.
Tex. Elec. Code § 64.012 historical note (West Supp. 2014) [Act of May 16, 2011, 82d Leg., R.S., ch. 123, § 25, 2011 Tex. Gen. Laws 619, 625].

. See N.C. Gen. Stat. §§ 163-82.8(e), 163-166.13(c)(2), 163-166.15, 163-182.1B (2015).

. See Ind. Code § 3-11.7-5-2.5 (2015).

. As discussed above, the Supreme Court has also noted the time constraints of this case in light of the scheduled elections in November of 2016. See Veasey v. Abbott, 136 S.Ct. at 1823.

. While the registration card does not contain a photo, it is a more secure document than a bank statement or electric bill and, presumably, one not as easily obtained by another person. It is sent in a nondiscriminatory fashion, free of charge, to each registered voter and therefore avoids any cost issues.